RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0205p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

In re: FAIR FINANCE COMPANY,

>*Debtor*.

BRIAN A. BASH, Chapter 7 Trustee,

>*Plaintiff-Appellant*,

*v*.

TEXTRON FINANCIAL CORPORATION,

>*Defendant-Appellee*.

No. 15-3854

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:12-cv-00987—Patricia A. Gaughan, District Judge.

Argued: April 22, 2016

Decided and Filed: August 23, 2016

Before: MOORE, GIBBONS, and DAVIS,[*] Circuit Judges.

_____

## COUNSEL

**ARGUED:** Daniel R. Warren, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellant. Mitchell A. Karlan, GIBSON, DUNN & CRUTCHER LLP, New York, New York, for Appellee. **ON BRIEF:** Daniel R. Warren, Thomas D. Warren, Joseph F. Hutchinson, Jr., David F. Proaño, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellant. Mitchell A. Karlan, GIBSON, DUNN & CRUTCHER LLP, New York, New York, James P. Schuck, Kenneth C. Johnson, Quintin F. Lindsmith, BRICKER & ECKLER LLP, Columbus, Ohio, for Appellee.

---

[*]The Honorable Andre M. Davis, Senior Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation.

---

**OPINION**

---

ANDRE M. DAVIS, Senior Circuit Judge.   In this appeal from the dismissal of an adversary proceeding in bankruptcy, we are obliged to explore some uncharted territory of Ohio substantive and procedural jurisprudence.

For more than six decades, members of the Fair family operated Fair Finance Company (the "Debtor") as a profitable and respected financial services company in Northeast Ohio.   In 2002, Tim Durham and James Cochran purchased the Debtor in a leveraged buyout and transformed the Debtor's factoring operation into a front for a Ponzi scheme, the proceeds of which went largely to fund Durham's and Cochran's extravagant lifestyles and various struggling business ventures.   In 2009, the Ponzi scheme collapsed when Durham, Cochran, and Rick Snow, the Debtor's Chief Financial Officer, were indicted for wire fraud, securities fraud, and conspiracy.   The Debtor entered involuntary bankruptcy and Brian Bash, as Chapter 7 Trustee (the "Trustee"), brought a number of adversary proceedings to recover on behalf of the Debtor's estate and, by extension, the Ponzi scheme's unwitting investors.   In the adversary proceeding at issue in this appeal, the Trustee brought numerous claims against Appellee Textron Financial Corporation ("Textron"), whose alleged assistance in the concealment and perpetuation of the Ponzi scheme lies at the root of all the claims asserted.   The district court granted Textron's Rule 12(b)(6) motion to dismiss for failure to state a claim, and the Trustee timely appealed the dismissal as to all but one of his claims.

As we explain within, we hold that, because the Trustee has set forth sufficient factual allegations to demonstrate the existence of an ambiguity in a 2004 financing and funding contract between the Debtor and Textron, we **REVERSE** the dismissal of the Trustee's actual fraudulent transfer claim.   We further hold that the Trustee was not required to plead facts in anticipation of Textron's potential *in pari delicto* affirmative defense to survive a motion to dismiss; accordingly, we **REVERSE** the dismissal of the Trustee's civil conspiracy claim. Finally, in light of the reinstatement of the Trustee's actual fraudulent transfer and civil conspiracy claims, we also **REVERSE** the dismissal of the Trustee's equitable subordination

and disallowance claims.   We **AFFIRM**, however, the dismissal of the Trustee's constructive fraudulent transfer claim as time barred.

I.

A.**[1]**

In 1934, Arthur Ray Fair founded the Debtor to finance the automobile sales of a family-owned car dealership.   B.C. R. 8 (First Am. Compl. at 26:152).**[2]**   Over the next six decades, members of the Fair family expanded the Debtor into a successful factoring company, purchasing accounts receivable at discounted rates and handling the billing and collection of client-owned customer accounts for a fee.   *Id.* at 26:151–54.   To support its purchase of accounts receivable, the Debtor sold investment certificates, or so-called V-Notes, to unsophisticated investors throughout Northeast Ohio.   *Id.* at 26:155–58.   The V-Notes routinely provided for six-month maturities and paid interest at a rate one-half of one percent higher than the rate payable on bank certificates of deposit.   *Id.* at 26:158–27:160.   The Debtor issued the V-Notes through private placements after filing offering circulars with the Ohio Division of Securities.   *Id.* at 27:161.   As of 2001, the Debtor held title to approximately $54 million in accounts receivable,

---

**[1]**We draw our factual recitations from the Trustee's amended complaint and documents—attached as exhibits to the parties' briefing on Textron's motion to dismiss—referenced and quoted therein.   "[A]s a general rule, matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss unless the motion is converted to one for summary judgment under Fed. R. Civ. P. 56."   *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) (quoting *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997)), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).   However, "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment."   *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007).   Because the attached documents were incorporated by reference and quoted extensively, they are central to the Trustee's claims.   Moreover, neither party contests the appropriateness of their consideration on review of Textron's motion to dismiss.

**[2]**For purposes of this opinion, documents filed in the United States Bankruptcy Court for the Northern District of Ohio prior to the motion to withdraw the adversary proceeding's reference to the bankruptcy court are cited using a "B.C." designation for "bankruptcy court."   The adversary proceeding's bankruptcy court docket is captioned *Bash v. Textron Financial Corporation, et al.*, No. 12-05101-aih.   Documents filed in the United States District Court for the Northern District of Ohio following the withdrawal of the adversary proceeding from the bankruptcy court are cited using a "D.C." designation for "district court."   The adversary proceeding's district court docket is captioned *Bash v. Textron Financial Corporation, et al.*, No. 12-cv-00987-PAG.   Only documents filed within the district court will have a Page ID.   Finally, documents filed in the United States Bankruptcy Court for the Northern District of Ohio in the Debtor's principal bankruptcy case are cited using a "B.P." designation for "bankruptcy petition."   The Debtor's principal bankruptcy docket is captioned *In re Fair Finance Company*, No. 10-50494.

owed $39 million in V-Notes, had never missed a V-Note payment (interest or otherwise), and had most recently operated at a $3 million profit. *Id.* at 27:165–28:166.

In January 2002, Donald Fair sold the Debtor to Fair Holdings, Inc. ("FHI") in a leveraged buyout. *Id.* at 5:24. Durham and Cochran, two Indiana businessmen, founded FHI to serve as a holding company for the Debtor. *Id.* at 5:25, 6:32–33. They also formed a secondary holding company, DC Investments, LLC ("DCI"), which existed exclusively to own FHI. *Id.* at 28:171–72. Durham and Cochran were DCI's sole members. *Id.* at 28:170.

To purchase and operate the Debtor, FHI entered into a Loan and Security Agreement ("2002 L&SA") with Textron and United Bank ("United") on January 7, 2002.[3] D.C. R. 20 (Mot. to Dismiss First Am. Compl. ("Mot. to Dismiss") Ex. A) (Page ID #874–915). Under the terms of the 2002 L&SA, Textron and United agreed to make a $22 million revolving line of credit[4] available to FHI and the Debtor. *Id.* at 3–4 (Page ID #876–77). In exchange for extending the line of credit, Textron and United were entitled to interest and fees on amounts borrowed, with all such payments to be made through a lockbox arrangement. Under the arrangement, payments made on Debtor-owned accounts receivable would be made directly into a lockbox account and a designated lockbox agent would transfer appropriate funds to Textron and United as necessary. *Id.* at 4–5 (Page ID #877–78). To secure the loan, FHI pledged all of its present and future assets, i.e., its non-diluted interest in the Debtor. *Id.* at 6–8 (Page ID #879–81).[5] Of particular relevance to the present action, the 2002 L&SA included the following provision regarding the scope of the security interest created thereunder:

> (c)     It is Borrower's express intention that this Agreement and the continuing security interest granted hereby, in addition to covering all present obligations of Borrower to Lenders and their respective Affiliates pursuant to the Obligations, shall extend to all future obligations of Borrower to Lenders intended as replacements or substitutions for said Obligations, whether or not such

---

[3]Immediately following the consummation of the leveraged buyout, the parties amended the 2002 L&SA to add the Debtor as a Borrower. D.C. R. 20 (Mot. to Dismiss First Am. Compl. ("Mot. to Dismiss") Ex. B) (Page ID #916–918)

[4]The 2002 L&SA provided that Textron and United's pro rata share of the line of credit would be $12 million and $10 million, respectively. D.C. R. 20 (Mot. to Dismiss Ex. A, at 3–4) (Page ID #876–77).

[5]To facilitate the leveraged buyout, FHI also issued a $4.1 million seller's note to Donald Fair secured by a second priority lien in FHI's assets. B.C. R. 8 (First Am. Compl. at 29:181–82).

Obligations are reduced or entirely extinguished and thereafter increased or reincurred.

*Id.* at 7 (Page ID #880). As discussed in this opinion, the continued efficacy of the security interest created by the 2002 L&SA is at the heart of the Trustee's fraudulent transfer claims.

The 2002 L&SA also provided that FHI and the Debtor would furnish Textron and United with (1) monthly certified financial statements, (2) yearly audited financial statements, (3) yearly financial statements and tax returns for the loan's guarantors (Durham and Cochran), and (4) any other relevant materials. *Id.* at 14–15 (Page ID #887–88). In addition, Textron and United enjoyed the right to audit FHI and the Debtor up to four times per year. *Id.* at 16 (Page ID #889). To perfect the security interest established under the 2002 L&SA, Textron and United filed a UCC Financing Statement with the Ohio Secretary of State on January 8, 2002. D.C. R. 20 (Mot. to Dismiss Ex. C) (Page ID #919–21).

After settlement of the leveraged buyout, Durham became the Debtor's CEO and immediately began a campaign of selling additional V-Notes with substantially longer maturities and elevated interest rates. B.C. R. 8 (First Am. Compl. at 6:36–7:37). Durham then directed a significant portion of the new V-Note capital into a series of "insider loans" for his personal benefit, the benefit of other failing companies that he and Cochran owned or controlled, and the benefit of the officers and directors of those failing companies. *Id.* at 7:37–38. Generally, the insider loans followed a common path: Durham would cause the Debtor to lend money to FHI (the Debtor's parent), and FHI would then lend a corresponding amount directly to an insider or to DCI (FHI's parent), which would then lend the money to an insider. *Id.* at 7:39.

By the end of 2002, the Debtor had made more than $30 million in insider loans. *Id.* at 7:40. By the end of 2006, that number had grown to approximately $137 million, and by September 2009, the Debtor had made more than $228 million in insider loans. *Id.* at 7:40–8:41. While the insider loans were delineated as performing assets in the Debtor's offering circulars, *id.* at 36:235–37:236, the loans were made on commercially unreasonable terms, "permitt[ing] financially distressed [i]nsiders to defer all payments for years at a time, to 'secure' the loans with inadequate collateral, without perfecting liens, and allow[ing] borrowers to exceed their credit limits without review," *id.* at 34:217–18. Moreover, when an insider loan approached

default, Durham would cause the Debtor to modify the loan and prevent the Debtor from enforcing its rights and/or collecting amounts due. *Id.* at 34:218–35:226. Unsurprisingly, at no point did the Debtor receive any significant payments on any of the insider loans, *id.* at 9:46, and as of the filing of the Debtor's bankruptcy petition, the outstanding balance on the insider loans totaled approximately $233 million, *id.* at 37:237.

During Durham and Cochran's ownership and control of the Debtor, the company did maintain its factoring operations. *Id.* at 8:44. However, because the Debtor's accounts receivable assets remained fairly steady, the company's factoring operation alone could not support its ever increasing issuance of V-Notes and insider loans. *Id.* at 8:44–9:48. Accordingly, by December 2003, the Debtor was operating as "a classic Ponzi scheme," constantly requiring the issuance of new V-Notes to pay off existing V-Notes as they matured and to make the requisite monthly interest payments to all V-Note holders. *Id.* at 9:47–48. Importantly, the offering circulars issued by the Debtor to effectuate the sale of new V-Notes concealed the Debtor's insolvency, "failed to fully and fairly disclose that the Debtor would use the proceeds of [the] V-Notes to make [i]nsider [l]oans," and "grossly overvalued" the insider loans that were made. *Id.* at 36:233–35. The outstanding balance to V-Note holders totaled approximately $208 million as of the filing of the Debtor's bankruptcy petition. *Id.* at 37:238.

Textron's March 29, 2002 audit of the Debtor and FHI, as well as subsequent internal communications, reveal that Textron knew, as early as spring 2002, that Durham had been causing the Debtor to make insider loans and that the Debtor had dramatically increased its V-Note placements. D.C. R. 66 (Order Redacting Decl. of Michael VanNiel in Connection with Trustee's Br. in Opp'n to Mots. of Textron Financial Corp. & Fortress Credit Corp. to Dismiss First Am. Compl. ("Redacted VanNiel Decl.") Exs. 1–2) (Page ID #3523–28). Further, Textron's August 2002 audit evidences the company's early concern regarding the Debtor and FHI's troubling business practices. D.C. R. 66 (Redacted VanNiel Decl. Ex. 4, at 3–4) (Page ID #3531–34). The official who reviewed the audit noted that the Debtor's "[t]otal assets grew primarily due to an $11.8 [million] investment in other current receivables," representing advances made to FHI, and that "[t]he cash was raised for the advances by issuing V-6 certificates." *Id.* at 3 (Page ID #3533). The official further noted that FHI had provided a series

of "loans to several affiliated entities" and included a recommendation that Textron examine the "financial health" of the insider loans going forward. *Id.* at 4 (Page ID #3534).

In a March 2003 internal Textron memorandum, a Textron official discussed the Debtor and FHI's financial positions in-depth and, when evaluating the Debtor's 2002 internal balance sheet, explained that the company had made a variety of loans to "companies substantially owned by Tim Durham and Jim Cochran" and had listed the loans as assets. D.C. R. 20 (Mot. to Dismiss Ex. F, at 7–8) (Page ID #956–57). The Textron official explained that the loans were entirely funded through the increasing issuance of V-Notes and that, should additional liquidity be needed in response to a rise in V-Note redemptions, Textron would expect the Debtor to liquidate its insider loans. *Id.* Despite the acknowledged risks associated with the Debtor's practice of issuing insider loans, the Textron official noted his belief that Textron's exposure was limited as a result of covenants contained in the 2002 L&SA, specifically the subordination of the V-Notes to Textron and United's security interest and the Debtor's ability to limit V-Note payments "in any calendar month to 10% of any calendar month's net cash." *Id.* at 3 (Page ID #952). Ultimately, the official expressed his belief that the overall relationship would continue to be a profitable one for Textron. *Id.* at 9 (Page ID #958).

As months passed, however, Durham's operation of the Debtor continued to be a point of concern for Textron. In an August 2003 letter to Durham, Textron's Senior Vice President of Portfolio Management, Ralph Infante, explained that FHI and the Debtor were in default under the 2002 L&SA and that Textron would require updated financials, access to the companies' certified public accountant, and access to the companies' legal counsel to address Textron's questions and concerns regarding the Debtor's V-Note program. D.C. R. 20 (Mot. to Dismiss Ex. G) (Page ID #959–60). Under the terms of the 2002 L&SA, the Debtor and FHI had been required to provide Textron with their 2002 audited financial statements by April 30, 2003. D.C. R. 20 (Mot. to Dismiss Ex. A, at 14–15) (Page ID #887–88). Yet, as of August 2003, Textron had only received a draft report of the companies' 2002 financials. D.C. R. 20 (Mot. to Dismiss Ex. G) (Page ID #959–60). Moreover, the draft audit it did receive showed a host of irregularities, including (1) the existence of "related party" transactions, a portion of which were nonperforming; (2) limited or non-existent security interests in the "related party" transactions;

and (3) line items that resulted in an overstating of each company's net worth.  D.C. R. 20 (Mot. to Dismiss Ex. H, at 7–8) (Page ID #967–68).

As the 2002 L&SA's January 6, 2004 maturity date approached, the parties began discussing whether a renewed agreement would be possible.  D.C. R. 20 (Mot. to Dismiss Exs. H–I) (Page ID #961–70).  On November 13, 2003, Textron's Infante sent an email to Durham and Cochran to communicate the results of a credit committee meeting during which Infante pitched replacing the line of credit established under the 2002 L&SA with a new commitment funded solely by Textron.  D.C. R. 20 (Mot. to Dismiss Ex. I) (Page ID #970).  Infante explained that, while the credit committee had yet to make a final determination, the Debtor and FHI's frequent insider loans and decision to use the Debtor's V-Note program "as a piggy bank to finance" the insider loans was a serious point of concern.  *Id.*  Infante also noted that the credit committee members believed that it was "wrong" for the V-Note capital to be used for anything but "the growth and profitability of [the Debtor]" and that, "[i]n today's world of Sarbanes-Oxley, predatory lending and recent court rulings," the credit committee members were concerned that their knowledge of where the V-Note proceeds were going "could come back to haunt" them.  *Id.*

Ultimately, however, after (1) reviewing the Debtor's V-Note circulars and determining that they complied with Ohio placement requirements, (2) receiving accountant assurances that the affiliated entities benefited by the insider loans had sufficient assets to secure the debts, (3) receiving Durham and Cochran's promise to have insiders pay down a portion of the loans, and (4) introducing a covenant that limited the creation of future insider loans, Textron felt comfortable maintaining its relationship with the Debtor and FHI.  D.C. R. 66 (Redacted VanNiel Decl. Ex. 9) (Page ID #3561–64).  United found no comfort in these considerations, however, and, as early as July 16, 2003, had written Textron and urged it to either buy out United's interest under the 2002 L&SA or exercise its rights under the 2002 L&SA by declaring the Debtor and FHI in default and accelerating the entire amount due under the promissory note.  D.C. R. 66 (Redacted VanNiel Decl. Ex 6) (Page ID #3548).  Textron chose the former option and worked with the Debtor and FHI to establish the terms under which Textron would move

forward without United, its "uncooperative" partner.  D.C. R. 20 (Mot. to Dismiss Ex. H) (Page ID #962–69); D.C. R. 66 (Redacted VanNiel Decl. Ex. 9) (Page ID #3561–64).

On January 6, 2004, the Debtor and FHI entered into a First Amended and Restated Loan and Security Agreement ("2004 ARL&SA").  D.C. R. 66 (Redacted VanNiel Decl. Ex. 10) (Page ID #3565–625).  The 2004 ARL&SA's opening recitals explained that (1) pursuant to the 2002 L&SA, Textron and United had "committed to make loans to [the Debtor and FHI] in an aggregate amount not to exceed $22,000,000" and that the Debtor and FHI "granted a security interest to [Textron and United] in substantially all [their] business assets"; (2) under the 2002 L&SA, the Debtor and FHI delivered to Textron "promissory notes, security agreements, mortgage deeds, guaranties and other loan documents" that, together with the 2002 L&SA, constituted the "Original Loan Documents"; (3) the Debtor, FHI, and Textron "desire[d] to amend and restate the Original Agreement in order to reduce the amount of the aggregate loans to $17,500,000 and to modify certain of the terms and conditions of the lending";[6] and (4) "[c]ontemporaneously with the execution of this Agreement," Textron agreed to purchase and United agreed to sell "and release all of its interest in the Original Loan Documents."  *Id.* at 1 (Page ID #3565).  As was the case with the 2002 L&SA, the 2004 ARL&SA incorporated a "Grant of Security Interest" provision, under which the Debtor and FHI "assign[ed] [Textron] a continuing security interest and lien upon" the Debtor and FHI's assets and  provided that:

> (c)      It is Borrowers' express intention that this Agreement and the continuing security interest granted hereby, in addition to covering all present obligations of Borrowers to Lender and its Affiliates pursuant to the Obligations, shall extend to all future obligations of the Borrowers to Lender intended as replacements or substitutions for the Obligations, whether or not the Obligations are reduced or entirely extinguished and thereafter increased and reincurred.

*Id.* at 7–8 (Page ID #3571–72).

The 2004 ARL&SA differed from the 2002 L&SA in several respects.  The 2004 ARL&SA provided for a new interest rate, a new fee schedule, and new events of default.  *Id.* at 5, 17–18 (Page ID #3569, 3581–82).  New covenants were added, one of which required the

---

[6]An internal Textron memorandum specifically explained that the Debtor would be able to operate under a decreased credit facility "due to [the Debtor's] ongoing access to the unsecured subordinate debt market in the form of the V6 certificate."  D.C. R. 66 (Redacted VanNiel Decl. Ex. 7) (Page ID #3550).

Debtor and FHI to "reduce the total amount of related-party indebtedness . . . in accordance with" an attached payment schedule, while another required the Debtor and FHI to refrain from "mak[ing] any loan or advances to any Affiliate, Dealer or any other Person." *Id.* at 11–14 (Page ID #3575–78). Several new conditions precedent were added, the most relevant of which required the Debtor and FHI to deliver to Textron 50% of the amount due to United under the Original Loan Documents or otherwise required to release United as well as "all accrued interest, fees, expenses, and other charges owing" under the Original Loan Documents. *Id.* at 14–15 (Page ID #3578–79). Additionally, because the Debtor and FHI's legal counsel had expressed concerns as to whether the insider loans were adequately disclosed in the V-Note offering circulars, the 2004 ARL&SA confirmed the parties' decision to amend the offering circulars but to postpone the release of the updated offering circulars to avoid sending "an unsettling message to the market." *Id.* at Schedule 25(p) (Page ID #3624); D.C. R. 66 (Redacted VanNiel Decl. Ex. 19) (Page ID #3813–14). One of the 2004 ARL&SA's final provisions provided that it was "intended by the Borrowers and  Lender to be the final, complete, and exclusive expression of the agreement between them" and that the "Agreement supersedes all prior oral or written agreements related to the subject matter hereof." D.C. R. 66 (Redacted VanNiel Decl. Ex. 10, at 23) (Page ID #3587).

In addition to executing the 2004 ARL&SA, the parties executed a new promissory note in the amount of $17,500,000. D.C. R. 66 (Redacted VanNiel Decl. Ex. 15) (Page ID #3733–35). The January 6, 2004 promissory note provided as follows: "This Promissory Note and the advances contemplated hereunder are made pursuant to the terms and provisions of that certain First Amended and Restated Loan and Security Agreement . . . ." *Id.* Additionally, "[f]or the purpose of inducing [Textron] to lend money or extend credit to [the Debtor and FHI] by a revolving loan . . . in the Maximum Loan Amount of $17,500,000," both Durham and Cochran executed new continuing unlimited personal guarantees. D.C. R. 66 (Redacted VanNiel Decl. Ex. 16) (Page ID #3736–51). Textron did not file a UCC financing statement upon the execution of the 2004 ARL&SA. On July 31, 2006, Textron did, however, file a UCC financing statement amendment, purporting to evidence the continuation of the security interest established on January 8, 2002, pursuant to the 2002 L&SA. D.C. R. 20 (Mot. to Dismiss Ex. D) (Page ID #922).

Despite the assurances of Durham and Cochran and the new covenants created in the 2004 ARL&SA, a series of internal Textron modification requests evidence the lender's knowledge and growing discontent concerning Durham and Cochran's commitment to continuing their fraudulent scheme. D.C. R. 66 (Redacted VanNiel Decl. Ex. 12) (Page ID #3628–96). For example, a February 10, 2005 modification request indicates that the Debtor and FHI continued to miss deadlines for providing Textron with audited financials. *Id.* (Page ID #3629–30). As it turned out, the delay stemmed from the Debtor and FHI's termination of their accounting firm in response to the firm's determination that it could not issue the Debtor an unqualified audit opinion due to its many concerns regarding the Debtor's insider loans and solvency.[7] B.C. R. 8 (First Am. Compl. at 68:415–71:426). And while the Debtor and FHI's new accounting firm issued an unqualified consolidated audit opinion for 2003 and 2004, the new firm later determined that the accounting analysis employed in the opinion was flawed, and it instructed Durham not to use the opinion in future offering circulars, an instruction Durham did not follow. *Id.* at 72:430–75:446.

When the new accounting firm conducted a new audit that employed the appropriate FIN 46[8] analysis, the audit showed that the Debtor and FHI had overvalued the insider loans since 2002 and that the combined entities were insolvent by more than $21 million. D.C. R. 66 (Redacted VanNiel Decl. Ex. 12) (Page ID #3666–68). After the firm provided the Debtor and FHI with its preliminary reports in the spring of 2006, the Debtor and FHI terminated the second accounting firm to avoid the release of an adverse audit opinion. B.C. R. 8 (First Am. Compl. at 75:446–48, 78:460–79:470); D.C. R. 66 (Redacted VanNiel Decl. Ex. 24) (Page ID #3882–96). The Debtor and FHI then chose to release financial statements that were reviewed by a third accounting firm and certified by Durham, as opposed to releasing audited financial statements. *Id.*

---

[7]The Debtor and FHI did not tell Textron that they had terminated their accounting firm but instead explained that the firm resigned to avoid a conflict of interest. D.C. R. 20 (Mot. to Dismiss Ex. M) (Page ID #986).

[8]FIN 46 is an anti-fraud interpretation developed by the Financial Accounting Standards Board that calls for a consolidated analysis of related entities to avoid inaccurate financial pictures. D.C. R. 20 (Mot. to Dismiss Ex. O) (Page ID #1006).

Textron continued to work with the Debtor and FHI through these issues, waiving various covenant violations and extending the loan on multiple occasions through the execution of ten distinct amendments to the 2004 ARL&SA. D.C. R. 66 (Redacted VanNiel Decl. Ex. 17) (Page ID #3752–3808). In exchange for the waivers and extensions, Textron received consideration in the form of significant non-refundable fees and assurances that Durham and Cochran were working to find an alternative lender that could refinance the loan and repay Textron in full. *Id.*; B.C. R. 8 (First Am. Compl. at 80:475–77). For example, upon the execution of the first waiver and amendment, Textron received a wavier fee of $30,000, D.C. R. 66 (Redacted VanNiel Decl. Ex. 12) (Page ID #3752–57), two $43,750 accommodation fees in exchange for the third and fourth amendments, *id.* (Page ID #3763–71), and a graduated series of fees totaling $135,000 in exchange for the execution of the seventh amendment to the 2004 ARL&SA, *id.* (Page ID #3783–88).

On July 20, 2007, the Debtor and FHI finally secured alternative funding in the form of a $23 million asset sale transaction, and Textron received a total payment of $16,999,927.09, representing all the money owed under the 2004 ARL&SA. B.C. R. 8 (First Am. Compl. at 82:493); D.C. R. 66 (Redacted VanNiel Decl. Ex. 18) (Page ID #3809–12). In turn, Textron agreed to release all liens securing the loan documents. D.C. R. 66 (Redacted VanNiel Decl. Ex. 18) (Page ID #3809–12). The Trustee alleges, and Textron does not dispute that, from the execution of the 2004 ARL&SA to Textron's payoff, the Debtor and FHI made more than $300 million in payments to Textron. Appellant's Opening Br. 14.

Approximately two years after Textron's relationship with the Debtor and FHI ended, the FBI raided the Debtor's headquarters, seizing its documents and computers. B.C. R. 8 (First Am. Compl. at 19:111). On March 15, 2011, Durham, Cochran, and the Debtor's Chief Financial Officer, Rick Snow, were indicted for wire fraud, securities fraud, and conspiracy. *Id.* at 20:113. All three were convicted of various counts alleged in the indictment, and each is now serving a federal prison sentence. *United States v. Durham*, 766 F.3d 672 (7th Cir. 2014) (affirming Cochran's twenty-five-year prison sentence and Snow's ten-year prison sentence); *United States v. Durham*, 630 F. App'x 634 (7th Cir. 2016) (unpublished) (affirming Durham's resentencing to a term of fifty years' imprisonment).

B.

After the FBI raided the Debtor's headquarters and the Ponzi scheme collapsed, certain V-Note holders filed a petition for involuntary bankruptcy against the Debtor. B.P. R. 1 (Involuntary Bankr. Pet. (Chapter 7)). Following his appointment, the Trustee filed a number of adversary proceedings in the Bankruptcy Court for the Northern District of Ohio, including the present action against Textron, Fortress Credit Corporation, and Fair Facility I, LLC. B.C. R. 1 (Compl.); B.C. R. 8 (First Am. Compl.). As to Textron, the only relevant defendant on appeal, the Trustee brought aiding and abetting claims, a conspiracy claim, claims to avoid and recover actual and constructive fraudulent transfers under 11 U.S.C. § 544(a) and (b)(1), O.R.C. § 1336.04(A)(1) and (A)(2), O.R.C. § 1336.05(A), O.R.C. § 2307.61, 11 U.S.C. § 550(a), and 11 U.S.C. § 551, and equitable subordination and disallowance claims. B.C. R. 8 (First Am. Compl. at 112–16, 124–26, 128, 130, 132, 135–37).

In March 2012, both Textron and the Trustee moved to have the adversary proceeding's reference to the bankruptcy court withdrawn pursuant to 28 U.S.C. § 157(d) so that the case could proceed in the United States District Court for the Northern District of Ohio. D.C. R. 1 (Def.'s Mot. to Withdraw Reference to the U.S. Bankr. Ct. for the Northern Dist. of Ohio) (Page ID #1–23); D.C. R. 2 (Trustee's Mot. for Entry of Order Withdrawing Reference of Adv. Proceedings) (Page ID #137–56). The district court granted the motions on April 20, 2012. D.C. R. 19 (Order Apr. 19, 2012) (Page ID #824). That same day, Textron moved in the district court to dismiss the Trustee's claims for lack of standing, failure to state a claim, and failure to timely file the claims within the applicable statutes of limitations. D.C. R. 20 (Mot. to Dismiss) (Page ID #825–1025). The district court referred the adversary proceeding to the bankruptcy court for pretrial supervision and the filing of a report and recommendation on all dispositive motions. D.C. R. 29 (Order Apr. 30, 2012) (Page ID #1605).

On July 31, 2012, the bankruptcy court issued a report and recommendation addressing Textron's motion to dismiss. D.C. R. 60 (R.&R. to Deny Def.'s Mot. to Dismiss) (Page ID #3458–65). The bankruptcy court recommended denying Textron's motion to dismiss in full, concluding that the Trustee had sufficiently pled each claim and that resolution of the claims on a motion to dismiss was inappropriate as Textron's arguments in favor of dismissal required the

resolution of factual disputes. *Id.* at 3–8 (Page ID #3459–65). Textron objected to the report and recommendation, D.C. R. 75 (Obj. of Def. to R.&R. on Mot. to Dismiss Am. Compl.) (Page ID #5412–50), and on November 9, 2012, the district court rejected the report and recommendation and granted Textron's motion to dismiss, D.C. R. 122 (Mem. Op. & Order Nov. 9, 2012) (Page ID #7210–58).

As to the Trustee's fraudulent transfer claims, the district court concluded as a matter of law that the 2004 ARL&SA was not a novation of the 2002 L&SA and, as a result, the security interest conveyed pursuant to the 2002 L&SA continued in full force. *Id.* at 24–28 (Page ID #7233–37). Further, because Textron had maintained a valid security interest in the Debtor's assets since 2002, neither the 2004 ARL&SA nor the payments made thereunder could qualify as "transfers" for purposes of a fraudulent transfer claim. *Id.* The district court also determined that any post-execution bad faith on the part of Textron did not render the 2002 security interest invalid for purposes of the Trustee's fraudulent transfer claims. *Id.*

Next, the district court addressed the Trustee's aiding and abetting claim and determined that dismissal was appropriate in light of a recent decision by the Ohio Supreme Court, in which the court explained that Ohio does not recognize a cause of action for tortious acts undertaken. *Id.* at 28–29 (Page ID #7237–38). Turning to the Trustee's civil conspiracy claim, the district court concluded that the allegations of the amended complaint established that the *in pari delicto* bar to tort recovery was applicable. *Id.* at 30–35 (Page ID #7239–44). Specifically, the district court explained that Durham and Cochran so dominated the Debtor that their conduct would be imputed to the Debtor and that, even if the Ohio Supreme Court would recognize an innocent insider exception to foreclose such imputation in certain circumstances, the Trustee had failed to allege the existence of any innocent insider. *Id.* After imputing Durham and Cochran's wrongful conduct to the Debtor, the district court found that the Debtor was, at a minimum, as culpable as Textron in perpetuating the Ponzi scheme, and it dismissed the Trustee's civil conspiracy claim under the *in pari delicto* affirmative defense. *Id.* Lastly, the district court concluded that the Trustee's equitable subordination and disallowance claims should also be dismissed. *Id.* at 35–36 (Page ID #7244–45). The bankruptcy court had recommended denying the dismissal of those claims because Textron had not yet filed a proof of claim in the Debtor's

bankruptcy proceeding. *Id.* Although Textron did not object to that recommendation, the district court *sua sponte* dismissed those claims because it had already dismissed the Trustee's underlying substantive claims. *Id.*

The November 9, 2012 memorandum opinion and order dismissing the Trustee's claims against Textron was merged into the district court's July 24, 2015 final judgment, and, on August 3, 2015, the Trustee filed a timely notice of appeal. D.C. R. 261 (Not. of Appeal) (Page ID #57085–87).

## II.

The Trustee argues that the district court improperly dismissed his fraudulent transfer, civil conspiracy, and equitable subordination and disallowance claims. We examine each claim in turn and review de novo whether the district court properly granted Textron's motion to dismiss. *Mertik v. Blalock*, 983 F.2d 1353, 1356 (6th Cir. 1993). "A claim survives such a motion if its '[f]actual allegations [are] enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.'" *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008) (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## A.

## 1.

We turn first to the Trustee's fraudulent transfer claims. The Trustee asserts that, pursuant to the Ohio Uniform Fraudulent Transfer Act ("UFTA"), Ohio Rev. Code § 1336.01 *et seq.*,[9] the Debtor can avoid the obligations incurred and payments made under the 2004 ARL&SA because the security interest conveyed by the Debtor to secure the 2004 ARL&SA and all the payments made in accordance with the Debtor's obligations under that agreement qualify as either actual or constructive fraudulent transfers. Because, as discussed below, the Trustee's constructive fraudulent transfer claim is barred by the applicable statute of limitations, we limit our discussion here to the Trustee's actual fraudulent transfer claim.

---

[9]The Trustee brings the fraudulent transfer claims under 11 U.S.C. § 544, which permits a bankruptcy trustee to seek avoidance of fraudulent transfers under applicable state laws.

Section 1336.04(A)(1) of the Ohio UFTA provides that "[a] transfer made or an obligation incurred by a debtor is fraudulent" and avoidable as to a creditor, "if the debtor made the transfer or incurred the obligation . . . [w]ith [the] actual intent to hinder, delay, or defraud any creditor of the debtor." The Ohio UFTA broadly defines "transfer" as "every direct or indirect, absolute or conditional, and voluntary or involuntary method of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." § 1336.01(L). And it defines "lien" to include "a security interest created by agreement." § 1336.01(H). Importantly, however, the Ohio UFTA explicitly carves out all "[p]roperty to the extent it is encumbered by a valid lien" from the statute's definition of a transferable asset. § 1336.01(B)(1).[10] When read in concert, these provisions provide that, to state a claim for relief under the Ohio UFTA, the Trustee must allege facts plausibly suggesting that the 2004 ARL&SA, including its conveyance of a security interest in all of the Debtor's property, and the payments made pursuant to the 2004 ARL&SA, constitute transfers under the Ohio UFTA. That is, he must show that the assets or interests in assets conveyed by the Debtor pursuant to the 2004 ARL&SA were not already encumbered by a valid lien.

The district court dismissed the Trustee's actual fraudulent transfer claim, concluding that the Trustee had failed to make such a showing. Specifically, the district court determined that, because the 2004 ARL&SA was merely a refinancing of the 2002 L&SA, the security interest established pursuant to the 2002 L&SA remained in full force and encumbered any assets or interests in assets conveyed with regard to the 2004 ARL&SA. *Bash v. Textron Fin. Corp.*, 483 B.R. 630, 646 (N.D. Ohio 2012). The district court thus concluded that the Trustee had failed to allege the existence of an avoidable transfer for purposes of the Ohio UFTA. *Id.*

On appeal, the Trustee argues that three independent grounds exist for nullifying or invalidating the lien, or security interest, established under the 2002 L&SA, thereby rendering the 2004 ARL&SA, including its grant of a security interest, and the payments made thereunder

---

[10]Property encumbered by a valid lien does not constitute a transferable asset because, from the time a valid lien is perfected, the property is no longer considered part of the debtor's estate. *Comer v. Calim*, 716 N.E.2d 245, 249 (Ohio Ct. App. 1998).

avoidable transfers.[11]  First, the Trustee contends that the 2004 ARL&SA was a novation of the 2002 L&SA and that, when the 2002 L&SA was extinguished, so too was the security interest granted thereunder.  Next, the Trustee argues that, if this Court turns first to the contractual obligations incurred pursuant to the 2004 ARL&SA and finds them avoidable as incurred for the purpose of defrauding the Debtor's creditors, then the 2002 lien securing those contractual obligations becomes a legal nullity.  Finally, the Trustee asserts that this Court may use its equitable powers to subordinate the 2002 security interest in light of Textron's post-perfection bad faith and that such subordination would effectively render Textron's lien invalid for purposes of the Ohio UFTA.

Because we conclude that the Trustee has demonstrated that the district court erred in determining as a matter of law that the parties did not intend the 2004 ARL&SA as a novation of the 2002 L&SA, we reverse the judgment of the district court on the Trustee's first theory and remand for further proceedings without examining the merits of the Trustee's other two arguments.  We note, however, that our silence as to the two alternative theories for invalidating the 2002 security interest should in no way be taken as a comment in favor of or against the viability of such arguments going forward; specifically, our *vacatur* of the judgment means that the district court may, in its discretion and in light of this opinion, revisit those issues upon remand.

2.

The Trustee argues that, under Ohio law, the 2004 ARL&SA constituted a novation of the 2002 L&SA.  Thus, the Trustee contends that, upon execution of the 2004 ARL&SA, the 2002 L&SA along with its underlying security interest was extinguished.  As a result, the Trustee asserts that the Debtor's assets were not encumbered by a preexisting valid lien and that he may therefore seek avoidance of the 2004 ARL&SA, including the security interest granted thereunder, and all payments made pursuant to that obligation as fraudulent transfers.  The

---

[11]At no point does the Trustee assert that the 2002 L&SA, its grant of a security interest, or any of the payments made to Textron pursuant to the 2002 L&SA constitute avoidable transfers under the Ohio UFTA, likely recognizing that Textron seemingly acted in good faith when it initially entered into business with Durham and Cochran—an affirmative defense allowing a recipient of a fraudulent transfer to nonetheless avoid liability.  *See* Ohio Rev. Code §1336.08(A) ("A transfer or obligation is not fraudulent . . . against a person who took in good faith and for a reasonably equivalent value . . . .").

district court disagreed with the Trustee's argument and, instead, determined that the 2004 ARL&SA constituted a mere refinancing of the 2002 L&SA that did not impact the ongoing validity of the 2002 security interest. At the motion to dismiss stage and on the record before us, however, we must agree with the Trustee that the allegations are sufficient to state a claim and that genuine factual disputes surround the issue of the effect of the 2004 ARL&SA on the continuing validity of the security interest conveyed under the 2002 L&SA.

"A contract of novation is created where a previous valid obligation is extinguished by a new valid contract, accomplished by substitution of parties or of the undertaking, with the consent of all the parties, and based on valid consideration." *McGlothin v. Huffman*, 640 N.E.2d 598, 601 (Ohio Ct. App. 1994). The Ohio Court of Appeals has explained that "[i]ntent, knowledge and consent are the essential elements in determining whether a purported novation has been accepted." *Nat'l City Bank v. Reat Corp.*, 580 N.E.2d 1147, 1149 (Ohio Ct. App. 1989) (alteration in original) (quoting *Bolling v. Clevepak Corp.*, 484 N.E.2d 1367, 1379 (Ohio Ct. App. 1984)). "A party's knowledge of and consent to the terms of a novation need not be express, but may be implied from circumstances or conduct." *Id.* "[T]he evidence of such knowledge and consent," however, "must be *clear and definite*, since a novation is never presumed." *Bolling*, 484 N.E.2d at 1379. These basic principles have routinely been applied in cases involving contracts delineating financial rights and obligations. *See, e.g.*, *Noland v. Wilmington Sav. Bank (In re D & K Aviation, Inc.)*, 349 B.R. 169, 175–77 (Bankr. S.D. Ohio 2006) (noting that, where a new note has been executed between existing parties, Ohio law provides for a presumption in favor of finding a new loan transaction to be "a renewal of the original debt that retains the same security" as opposed to a novation; a party may overcome this presumption by demonstrating that the parties intended for the "new loan transaction [to] discharge[] [the] prior debt and its corresponding security"); *Holland v. Assocs. Fin. (In re Holland)*, 16 B.R. 83, 87 (Bnkr. N.D. Ohio 1981) ("It is well settled in Ohio that renewals of notes, or changes in the form of the evidence of a precedent debt, do not create a new debt, or operate as a discharge or satisfaction of the old debt, unless it is expressly agreed between the parties.").

Here, the district court concluded as a matter of law that the parties clearly intended the 2004 ARL&SA to be a mere refinancing of the 2002 L&SA and not a novation. In so concluding, the district court emphasized that (1) the 2004 ARL&SA provided for a security interest in the same collateral that was encumbered under the 2002 L&SA; (2) the 2004 ARL&SA actually reduced the aggregate line of credit available to the Debtor; (3) the language of the 2002 L&SA[12] provided for Textron's security interest to extend to cover "future obligations of Borrower to Lenders intended as replacements or substitutions for said Obligations, whether or not such Obligations are reduced or entirely extinguished and thereafter increased"; and (4) one of the 2004 ARL&SA's recitals set forth the parties' "desire to amend and restate the Original Agreement." *Bash*, 483 B.R. at 647–48. These facts, to varying degrees, do support the district court's conclusion that the parties did not clearly intend the 2004 ARL&SA to be a novation of the 2002 L&SA. Importantly, however, there remains extensive evidence that went unexamined by the district court, evidence that supports the Trustee's contention that the parties clearly and overwhelmingly manifested their intent for the 2004 ARL&SA to constitute a novation of the 2002 L&SA, making it inappropriate to determine the parties' intent at the motion to dismiss stage. *See Crane Hollow, Inc. v. Marathon Ashland Pipe Line, LLC*, 740 N.E.2d 328, 340 (Ohio Ct. App. 2000) (noting that, "if [a] contract is ambiguous, ascertaining the parties' intent constitutes a question of fact").

Turning first to the text of the 2004 ARL&SA, several provisions evidence the parties' intent for the 2004 ARL&SA to wholly replace and extinguish the 2002 L&SA as the operative agreement between the parties. For example, Paragraph 39 expressly sets forth the parties' desire to have the 2004 ARL&SA "supersede[] any and all prior oral or written agreements relating to the subject matter thereof." D.C. R. 66 (Redacted VanNiel Decl. Ex. 10, at 23) (Page ID #3587). In the same vein, Paragraph 35 explains that the 2004 ARL&SA "constitutes the entire agreement of Borrowers and Lender relative to the subject matter hereof." *Id.* at 21 (Page ID #3585). Further, in Paragraph 11, the Debtor and FHI agreed to "grant, pledge, convey and

---

[12]The Trustee contends that the district court inappropriately relied on evidence outside the 2004 ARL&SA when examining the parties' intent. *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996) ("The intent of the parties is presumed to reside in the language they chose to use in their agreement."). Because the 2004 ARL&SA is ambiguous as to the parties' intent, however, an exploration of relevant extrinsic evidence is permitted. *Shifrin v. Forest City Enters. Inc.*, 597 N.E.2d 499, 501 (Ohio 1992).

assign" a new security interest in and lien upon their property to Textron "to secure the prompt and full payment and complete performance of all obligations of Borrowers to Lender under [the 2004 ARL&SA]." *Id.* at 6–8 (Page ID #3570–72). Lastly, in the conclusion to the 2004 ARL&SA's recitals, the parties explicitly confirmed that the 2004 ARL&SA was the product of "valuable consideration, the receipt and sufficiency of which are hereby acknowledged." *Id.* at 1 (Page ID #3565). Read together, these provisions support a finding that the parties demonstrated their intent to "extinguish[] their obligations under the prior agreement" and be bound anew under the terms of the 2004 ARL&SA. *See 216 Jamaica Ave., LLC v. S & R Playhouse Realty Co.*, 540 F.3d 433, 439 (6th Cir. 2008) (applying Ohio law).

We find additional evidence of the parties' intent to have the 2004 ARL&SA operate as a novation of the 2002 L&SA in the circumstances surrounding the execution of the 2004 ARL&SA. First, the parties entered into the 2004 ARL&SA on the date the 2002 L&SA matured. Second, the parties replaced the 2002 promissory note and personal guarantees with a new promissory note and new personal guarantees. Third, the 2004 ARL&SA imposed significant new terms on both parties, including (1) new interest rate and fee terms; (2) an increased financial commitment on the part of Textron; (3) a requirement that the Debtor and FHI deliver to Textron 50% of the amount required to obtain United's release from the 2002 L&SA as well as "all accrued interest, fees, expenses and other charges owing by Borrowers under the Original Agreement"; and (4) the removal of United as a lender. D.C. R. 66 (Redacted VanNiel Decl. Ex. 10, at 14–15) (Page ID #3578–79). It is true that any one of these facts, in isolation, might fail to constitute a clear manifestation of the parties' intent to have the 2004 ARL&SA serve as a novation of the 2002 L&SA. However, when examined together, in conjunction with the relevant provisions of the 2004 ARL&SA, and in the light most favorable to the Trustee as the nonmoving party, these facts demonstrate, at the very least, the existence of an ambiguity as to whether the parties clearly intended the 2004 ARL&SA to extinguish the 2002 L&SA. *Potti v. Duramed Pharm, Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (explaining that, "[u]nder Ohio law, [while] interpretation of written contract terms is a matter of law for initial determination by the court," "when the relevant contract language is ambiguous . . . the job of interpretation is turned over to the fact finder"). To be sure, the ambiguity in this case is not so much over the discrete meaning of a contract term or the elements of a bargained-for

performance. Rather, it derives from the unique role an ostensible novation plays in setting the framework for performance. Under the circumstances here, a "new agreement" does not necessarily *require* the creation of a new security interest, but neither does a "new agreement" *foreclose* a finding of an intent on the part of the contracting parties that prior dealings have come to an end and that a new lien be created.

In that light, it bears mention that the principal, if not singular, case that the district court relied upon, *Official Committee of Unsecured Creditors of Tousa, Inc. v. Citicorp North America, Inc. (In re TOUSA, Inc.)*, No. 09-60589, 2011 WL 1627129 (S.D. Fla. Mar. 4, 2011), is distinguishable from the case here. In *In re TOUSA, Inc.*, the district court concluded that the execution of a Second Amended and Restated Revolving Credit Agreement did not constitute a new obligation for the purposes of a fraudulent conveyance claim because a preexisting security agreement remained in effect. *Id.* at *7–8. In determining that the initial security agreement still bound the plaintiff, the district court relied heavily on the Second Amended and Restated Revolving Credit Agreement's explicit statement that "it was the 'intent of the parties . . . that the security interests and [l]iens granted in the [c]ollateral under and pursuant to the [o]riginal [s]ecurity [a]greement shall continue in full force and effect.'" *Id.* at *1, *7 (alterations in original). No such language exists in the 2004 ARL&SA at issue in this case and that renders decision of the issue as a matter of law especially challenging. We think that challenge cannot be met here.

Accordingly, because the Trustee has established the existence of an ambiguity as to whether the parties clearly intended the 2004 ARL&SA to extinguish the 2002 L&SA and the security interest it created, we conclude that the district court erred when it determined as a matter of law that the 2004 ARL&SA was not a novation of the 2002 L&SA and that the security interest created pursuant to the 2002 L&SA remained in full force. The Trustee sufficiently showed, for purposes of withstanding Textron's motion to dismiss, that the Debtor's assets were no longer encumbered by a preexisting valid lien when the parties executed the 2004 ARL&SA and the Debtor granted Textron a new security interest in its assets.

Moreover, we hold that the Trustee has sufficiently stated a plausible claim for relief under the Ohio UFTA. The Trustee pled facts that, taken as true, demonstrate that the 2004

ARL&SA, the security interest the Debtor granted pursuant to the 2004 ARL&SA, and all payments made by the Debtor in accordance with its obligations under the 2004 ARL&SA amount to fraudulent transfers under the Ohio UFTA because each transaction was undertaken in an effort to perpetuate a Ponzi scheme that inevitably collapsed and left hundreds of unsophisticated Ohio investors holding the bag. *See, e.g.*, *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 636–37 (Bankr. S.D. Ohio 2006) (compiling cases in which transfers made in the course of a Ponzi scheme were determined to have been made with the actual intent to hinder, delay, or defraud creditors as a matter of law).[13]

3.

As an alternative basis for affirming the dismissal of the fraudulent transfer claims, Textron argues that the claims are barred by the applicable statutes of limitations. For purposes of an actual fraudulent transfer claim, the Ohio UFTA provides that:

> [a] claim for relief with respect to a transfer or an obligation that is fraudulent
> . . . is extinguished unless [the] action is brought . . . within four years after the
> transfer was made or the obligation was incurred or, if later, within one year after
> the transfer or obligation was or reasonably could have been discovered by the
> claimant.

Ohio Rev. Code § 1336.09(A). In the case of a constructive fraudulent transfer claim, the Ohio UFTA provides that the claim must be brought "within four years after the transfer was made or the obligation was incurred." § 1336.09(B).

Here, the Trustee is seeking to avoid the obligations incurred under the 2004 ARL&SA and all transfers of assets made in connection with the 2004 ARL&SA, including the grant of the 2004 security interest. The parties executed the 2004 ARL&SA on January 6, 2004; the Debtor's bankruptcy petition was not filed until February 8, 2010. Accordingly, because the Trustee brought the constructive fraudulent transfer claim well outside the applicable four-year

---

**13**And while Textron argues that the novation analysis is ultimately irrelevant because the 2004 ARL&SA was the subject of its own valid lien, Textron cannot use the creation of a lien that the Trustee has plausibly alleged is itself avoidable as a fraudulent transfer as a shield from application of the Ohio UFTA. *Cf.* § 1336.01(L) (broadly defining "transfer" as "every direct or indirect, absolute or conditional, and voluntary or involuntary method of disposing of or parting with an asset or an interest in an asset, . . . includ[ing] payment of money, release, lease, *and creation of a lien or other encumbrance*" (emphasis added)).

statute of limitations, we agree with Textron and conclude that the Trustee's constructive fraudulent transfer claim is time barred.  As for the Trustee's actual fraudulent transfer claim, the parties agree that it must fall within the ambit of the latter portion of § 1336.09(A), the provision's discovery rule, in order to be timely.  The parties disagree, however, as to whether, for purposes of § 1336.09(A), discovery occurs when the transfer is discoverable or when the transfer's fraudulent nature is discoverable.

When resolving an issue of state law, "we look to the final decisions of that state's highest court, and if there is no decision directly on point, then we must make an *Erie* guess to determine how that court, if presented with the issue, would resolve it." *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013).  "Intermediate state appellate courts' decisions are also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008).  In this instance, neither the Ohio Supreme Court nor Ohio's Court of Appeals has directly addressed the issue before us.  Accordingly, we must "consider all relevant data, including jurisprudence from other jurisdictions," *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) (internal citations and quotation marks omitted), and we must "make [the] best prediction, even in the absence of direct state court precedent, of what the [Ohio] Supreme Court would do if it were confronted with this question," *Managed Health Care Assocs., Inc. v. Kethan*, 209 F.3d 923, 927 (6th Cir. 2000) (first alteration in original) (quoting *Welsh v. United States*, 844 F.2d 1239, 1245 (6th Cir. 1988)).

The only cases to have directly addressed the issue of accrual of a claim under the discovery rule of § 1336.09(A) of the Ohio UFTA have arisen in the federal district courts sitting in Ohio, and those decisions, in addition to reaching varied conclusions, offer little in the way of guidance.  *See Bradley v. Miller*, 96 F. Supp. 3d 753 (S.D. Ohio 2015); *Fitness Quest Inc. v. Monti*, No. 5:06CV2691, 2012 WL 3587491 (N.D. Ohio Aug. 20, 2012); *Treinish v. Spitaleri (In re Spitaleri)*, No. 05-94988, 2006 WL 4458357 (Bankr. N.D. Ohio May 9, 2006).  For example, in 2006, the Bankruptcy Court for the Northern District of Ohio concluded that the Ohio UFTA did not provide a savings clause, as was the case with Ohio's repealed fraudulent conveyance statute, but instead provided a "constructive discovery" clause that hinged on discovery of the

transfer and not on discovery of the fraud. *In re Spitaleri*, 2006 WL 4458357, at *2. In making this distinction, however, the court did not cite any Ohio cases that had previously required a plaintiff to demonstrate that she discovered the existence of the transfer within one year of filing her complaint, as opposed to requiring that she establish when she discovered the transfer's fraudulent nature. *Id.*

While a district court in another case relied on *In re Spitaleri* to conclude that "the statute of limitations on Ohio fraudulent transfer claims begins to run on the date that a creditor could have discovered the transfer, and not when the alleged fraud was discovered," the court sought to bolster this holding by citing two unpublished opinions of the Ohio Court of Appeals. *Fitness Quest, Inc.*, 2012 WL 3587491, at *5 (citing *Davis v. McDowell*, No. H-06-001, 2006 WL 2242875 (Ohio Ct. App. June 30, 2006); *Cunningham v. Cunningham*, No. 01CA007938, 2002 WL 1263964 (Ohio Ct. App. May 29, 2002)). Those state court decisions, however, prove fairly unsupportive upon close inspection. In each instance, the state court employed a limited constructive discovery analysis, at no point directly considering whether discovery of a transfer without knowledge of its fraudulent nature would be sufficient, presumably because, in each case, it appears that the creditor actually became aware of the transfer and the transfer's fraudulent nature simultaneously. *Davis*, 2006 WL 2242875, at *1 (discovering that appellant transferred home months after claimant obtained a state court judgment against appellant); *Cunningham*, 2002 WL 1263964, at *2 (discovering, during the course of divorce proceedings, that appellant "gifted" home to his brother the same day appellant filed for divorce).

More recently, a district court for the Southern District of Ohio charted a contrary course altogether. *See Bradley*, 96 F. Supp. 3d at 770. The court in *Bradley* relied on Ohio's general discovery-rule principles to conclude that the Ohio UFTA's discovery rule would only begin to run once the plaintiff had "knowledge of such facts as would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry." *Id.* (quoting *Hambleton v. R. G. Barry Corp.*, 465 N.E.2d 1298, 1300–01 (Ohio 1984)). Accordingly, because the plaintiff "'possessed knowledge sufficient to lead a reasonably prudent person to make inquiry and had such inquiry been made with reasonable care and diligence, it would have led to the discovery of

the alleged' fraudulent transfer," the district court dismissed the plaintiff's fraudulent transfer claim as time barred. *Id.* (quoting *Hambleton*, 465 N.E.2d at 1301).

Ultimately, while direct guidance is limited or altogether absent, in light of Ohio's broader statute of limitations and discovery rule case law, jurisprudence from other courts, and the purpose of the Ohio UFTA, we hold that, if the Ohio Supreme Court were presented with this issue, it would conclude that the discovery rule starts to run, and a claim accrues, for purposes of § 1336.09(A) when the plaintiff reasonably could have discovered the transfer's fraudulent nature.

Ohio courts have yet to specifically offer direction as to the proper trigger for the Ohio UFTA's discovery rule. They have, however, routinely applied the discovery rule in response to statutory provisions and common law principles of equity to toll applicable statutes of limitations until an injured party "discovers or, in the exercise of reasonable care, should have discovered" her injury. *Invr's REIT One v. Jacobs*, 546 N.E.2d 206, 209–11 (Ohio 1989) (concluding that the discovery rule provided for under Ohio Rev. Code § 2305.09(D) resulted in the tolling of the statute of limitations in fraud, conversion, and breach of trust cases until the plaintiff discovered or reasonably could have discovered the injury that forms the basis of her suit); *see Zimmie v. Calfee, Halter & Griswold*, 538 N.E.2d 398, 401 (Ohio 1989) (explaining that, under the discovery rule, a cause of action accrues and the statute of limitations begins to run on a legal malpractice claim "when there is a cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney"); *O'Stricker v. Jim Walter Corp.*, 447 N.E.2d 727, 730–31 (Ohio 1983) (determining that, even before the Ohio legislature amended Ohio Rev. Code § 2305.10 to expressly provide for a discovery rule for asbestos-related exposure claims, equitable principles required a tolling of the statute of limitations until the plaintiff "discovered his cancer and the causal relationship to asbestos exposure").

Throughout each application of the discovery rule, the crux of the inquiry was not at what point in time the defendant engaged in the allegedly wrongful conduct but at what point in time the plaintiff possessed or should have possessed, upon the exercise of reasonable diligence, "actual knowledge not just that [she] has been injured but also that the injury was caused by the

conduct of the defendant." *Flagstar Bank, F.S.B. v. Airline Union's Mortg. Co.*, 947 N.E.2d 672, 676 (Ohio 2011). Were we to adopt the interpretation offered by Textron in this case, that the Ohio UFTA's discovery rule begins to run when a plaintiff discovers, or upon the exercise of reasonable diligence, could have discovered the mere existence of the transfer, we would be adopting an application of the discovery rule that is in tension with Ohio's broader statute of limitations and discovery rule jurisprudence—jurisprudence that the Commissioners were aware of when adopting the UFTA. *See SASCO 1997 NI, LLC v. Zudkewich*, 767 A.2d 469, 475 (N.J. 2001) (explaining that the National Conference of Commissioners on Uniform State Laws, which approved the UFTA in 1984, "drafted the tolling provision [of the UFTA] to mirror the common-law discovery rule which, they noted, was generally applicable to fraud actions" (citing National Conference of Commissioners on Uniform State Laws, *Proceedings in Committee of the Whole on the Uniform Fraudulent Transfer Act* 117 (July 29, 1984))). Rather, Ohio precedent weighs in favor of our conclusion that § 1336.09(A)'s one-year discovery period begins to run when a plaintiff discovers or, upon the exercise of reasonable diligence, could have discovered the transfer and its fraudulent nature. This is because, absent requiring the actual or constructive discovery of a transfer's fraudulent nature, application of the discovery rule would continue to "lead to the unconscionable result that the injured party's right to recovery c[ould] be barred by the statute of limitations before he is even aware of its existence." *O'Stricker*, 447 N.E.2d at 730 (internal citation and quotation marks omitted).

In addition to aligning with Ohio's broader statute of limitations and discovery rule jurisprudence, reading § 1336.09(A)'s one-year discovery period as beginning to run when the plaintiff discovers or, upon the exercise of reasonable diligence, could have discovered the transfer's fraudulent nature is supported by the decisions of other state courts to have addressed this aspect of their states' UFTA. While not every jurisdiction to have taken up the discovery rule has so concluded, *see Nat'l Auto Serv. Ctrs., Inc. v. F/R 550, LLC*, No. 2D14-3632, 2016 WL 1238265, at *5 (Fla. Dist. Ct. App. Mar. 30, 2016) (determining that the plain language of § 726.110(1) of Florida's UFTA mandates that the one-year discovery period begins to run "from the date the transfer was discovered or could reasonably have been discovered"), we find persuasive the numerous state court decisions that have concluded that a coherent reading of the UFTA's full statute of limitations provision, the overall purpose of the UFTA, and general

discovery rule principles support a determination that discovery for purposes of a fraudulent transfer claim requires both knowledge of the transfer and knowledge of the transfer's fraudulent nature. *See, e.g.*, *Schmidt v. HSC, Inc.*, 319 P.3d 416, 426 (Haw. 2014) (en banc) (explaining that, because "[t]he term 'transfer' in HRS § 651C-9(1) clearly refers to the 'fraudulent transfer' identified in the preceding" portion of the statute of limitations provision and because "the obvious purpose of the UFTA is to prevent fraud and to provide a remedy to those who are victims of fraudulent transfers," the discovery rule allowed a plaintiff "to file an action within one year of the discovery of the 'fraudulent nature' of a transfer"); *Workforce Sols. v. Urban Servs. of Am., Inc.*, 977 N.E.2d 267, 278–79 (Ill. App. Ct. 2012) (relying on general Illinois discovery rule principles to conclude that the discovery rule of Illinois's UFTA "postpon[es] the start of the limitations period until the injured party knows or should know it has been injured and knows or should know that the injury was wrongly caused"); *Freitag v. McGhie*, 947 P.2d 1186, 1189 (Wash. 1997) (en banc) (concluding that "[c]ommon sense and the statutory purpose of the UFTA necessitate a finding that the statute begins to run with the discovery of the fraudulent nature of the conveyance"); *see also Duran v. Henderson*, 71 S.W.3d 833, 839 (Tex. Ct. App. 2002) (noting that, under the UFTA's discovery rule, a cause of action accrues when the claimant discovers the fraud or would have discovered the fraud upon the exercise of reasonable diligence); *Moore v. Browning*, 50 P. 3d 852, 859 (Ariz. Ct. App. 2002) (same).

Finally, we note that, in deeming discovery to occur at the point when a transfer's fraudulent nature is discovered or reasonably could be discovered, we are mindful of the broader purpose of the Ohio UFTA. The Ohio UFTA's overall purpose is to discourage fraud and provide aggrieved creditors with a means to recover assets wrongfully placed beyond their reach. Accordingly, to require a claimant to bring suit within one year of discovering a transfer, without having discovered facts that would put the claimant on notice as to the transfer's fraudulent nature, would be to interpret § 1336.09(A) in a manner that is directly at odds with the animating purpose of the UFTA. Because, "[i]f the statute were to begin to run when the transfer was made, without regard as to whether the claimant discovered or could have discovered the fraudulent nature of the transfer, those successful at concealing a fraudulent transfer would be rewarded" and those injured would have their claims lapse before even becoming aware of the damage, as pointedly illustrated by the facts in this case. *Freitag*, 947 P.2d at 1190.

In sum, mindful of Ohio's broader statute of limitations and discovery rule jurisprudence, the interpretations of the discovery rule in other jurisdictions, and the overall purpose of the Ohio UFTA, we conclude that the Ohio Supreme Court, if faced with this issue, would determine that § 1336.09(A)'s discovery rule begins to run at the point when a plaintiff discovers or, in the exercise of reasonable care, could have discovered the transfer and its fraudulent nature. Applying that rule here, the execution of the 2004 ARL&SA was first reasonably discoverable as of August 2004, when the Debtor's offering circulars filed with the Ohio Division of Securities made note of the $17,500,000 line of credit created under the 2004 ARL&SA. However, the second amended complaint contains extensive factual allegations to support the Trustee's contention that the injured investors did not and could not have reasonably discovered the fraudulent nature of the 2004 ARL&SA and the lien created thereunder until November 24, 2009, when the FBI raided the Debtor's offices and Durham and Cochran's operation of the Debtor as a Ponzi scheme was revealed—a date delayed by Durham and Cochran's purposefully inadequate disclosures and improper accounting practices, both of which were undertaken with Textron's acquiescence. Accordingly, because the Debtor's investors filed the Chapter 7 bankruptcy petition against the Debtor on February 8, 2010, we conclude that the Trustee's actual fraudulent transfer claim was timely under § 1336.09(A)'s discovery rule.

B.

Having determined that the Trustee's actual fraudulent transfer claim survives Textron's motion to dismiss, we next address the Trustee's civil conspiracy claim. Textron argues that three independent grounds exist for affirming the district court's dismissal of the Trustee's civil conspiracy claim: lack of standing, the affirmative defense of *in pari delicto*, and limitations. We address (and reject) each argument in turn.

1.

"As a creature of statute, the trustee in bankruptcy has only those powers conferred upon him by the Bankruptcy [Code]." *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 853 (6th Cir. 2002) (alteration in original) (quoting *Cissell v. Am. Home Assurance Co.*, 521 F.2d 790, 792 (6th Cir. 1975)). Pursuant to 11 U.S.C. § 541(a)(1), a "trustee stands in the

shoes of the debtor and has standing to bring any action that the bankrupt could have brought had he not filed a petition for bankruptcy." *In re Cannon*, 277 F.3d 853. Conversely, "[i]f a cause of action belongs solely to the estate's creditors, . . . then the trustee has no standing to pursue the claim." *Id.* Whether a cause of action belongs to the debtor estate or to its creditors is a question of state law. *Id.*

Textron urges this Court to adopt the Second Circuit's reasoning in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991), which concluded that, "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Id.* at 118. The court elaborated however, that whether a trustee has standing to recover for "damage to the *corporation*, apart from that done to the third-party creditor noteholders" was a separate question. *Id.* at 118–19. To answer the latter question, the Second Circuit considered whether the corporation had possessed, before it entered bankruptcy, any claims under which the third party "could have been held liable" and ultimately concluded that, because the corporation's sole stockholder and decision maker participated in the fraud alongside the third party, any damage endured fell exclusively on the creditors, not the corporation. *Id.* at 119.

As other circuits have recognized, the Second Circuit's decision in *Wagoner* appears to conflate the affirmative *in pari delicto* defense[14] with the issue of standing. *See, e.g., Moratzka v. Morris (In re Senior Cottages of Am., LLC)*, 482 F.3d 997, 1003 (8th Cir. 2007) (collecting cases in which "other circuits have declined to conflate the constitutional standing doctrine with the *in pari delicto* defense"); *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1149–50 (11th Cir. 2006) (explaining that, while a debtor's wrongdoing was material to the ultimate success of a trustee's claim against an alleged accomplice in the debtor's Ponzi scheme, the debtor's wrongdoing did not bear on the trustee's standing "because '[a]n analysis of standing does not include an analysis of equitable defenses, such as *in pari delicto*'" (alteration in original) (quoting *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,

---

[14]The *in pari delicto* defense stems from "the equitable principle that '[n]o Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act.'" *Terlecky v. Hurd (In re Dublin Sec., Inc.)*, 133 F.3d 377, 380 (6th Cir. 1997) (alteration in original) (quoting *Jones v. Hyatt Legal Servs. (In re Dow)*, 132 B.R. 853, 860 (Bankr. S.D. Ohio 1991)). The defense and its application to the Trustee's civil conspiracy claim will be analyzed in depth in the following section.

267 F.3d 340, 346 (3d Cir. 2001))); *R.F. Lafferty*, 267 F.3d at 346 ("In general, [s]tanding consists of both a case and controversy requirement stemming from Article III, Section 2 of the Constitution, and a subconstitutional prudential element. An analysis of standing does not include an analysis of equitable defenses, such as *in pari delicto*." (alteration in original) (internal citations and quotation marks omitted)). We think the reasoning of these cases is sound, and we therefore decline to inject an equitable defense into Article III of the Constitution's "case or controversy" requirement. Rather, our task here is to determine whether (1) the plaintiff has alleged that the debtor "suffered some actual or threatened injury due" to the alleged illegal conduct of the defendant; (2) the injury is "fairly traceable to the challenged action"; and (3) there is a "substantial likelihood that the relief requested will redress or prevent [the plaintiff]'s injury." *In re Cannon*, 277 F.3d at 852 (alteration in original) (quoting *Grendell v. Ohio Sup. Ct.*, 252 F.3d 828, 832 (6th Cir. 2001)).

The Trustee's amended complaint explicitly alleges an injury to the Debtor. Specifically, the Trustee asserts that Textron, in exchange for hundreds of thousands of dollars in interest and fees, not only turned a blind eye to Durham and Cochran's fraudulent behavior, but actually assisted the two Indiana businessmen in looting the Debtor and transforming its once profitable factoring operation into a front for a Ponzi scheme. Accordingly, because the relief requested would redress the Debtor's alleged injury and because the alleged injury is separate from any injury suffered by the Debtor's investors, we conclude that the Trustee has standing to pursue the civil conspiracy claim.

2.

While *in pari delicto* principles do not deprive the Trustee of standing to bring a civil conspiracy claim against Textron, the affirmative defense is by no means immaterial at this juncture. As Textron asserted and the district court concluded, the Trustee's civil conspiracy claim is likely barred by the common law *in pari delicto* defense, which "derives from the Latin, *in pari delicto potior est conditio defendentis*," meaning "[i]n a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (alterations in original) (quoting Black's Law Dictionary 711 (5th ed. 1979)). This equitable defense is used to bar a plaintiff's recovery when the

plaintiff "bears at least substantially equal responsibility for the underlying illegality" upon which the claim is based, *Pinter v. Dahl*, 486 U.S. 622, 635–36 (1988), in light of "the policy that 'no Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act,'" *Downie-Gombach v. Laurie*, 41 N.E.3d 858, 865 (Ohio Ct. App. 2015) (quoting *In re Dow*, 132 B.R. 853, 860 (Bankr. S.D. Ohio 1991)). The *in pari delicto* defense has repeatedly been used to bar the actions of "bankruptcy trustee[s] against third parties who participated in or facilitated wrongful conduct of the debtor[s]." *Mosier v. Callister, Nebeker & McCullough*, 546 F.3d 1271, 1276 (10th Cir. 2008) (collecting cases).

Here, the Trustee acknowledges of course that he stands in the shoes of the Debtor and that the *in pari delicto* defense may be raised against a bankruptcy trustee to the same extent it could have been raised against a debtor prior to the filing of bankruptcy. Appellant's Opening Br. 42. The Trustee, however, argues that the district court's dismissal of his civil conspiracy claim pursuant to the *in pari delicto* defense was inappropriate because Durham and Cochran's fraudulent conduct should not have been imputed to the Debtor. *Id.* at 43.

A principal is generally charged with the knowledge of and conduct undertaken by its agent operating within the scope of his employment. *First Nat'l Bank of New Bremen v. Burns*, 103 N.E. 93, 94 (Ohio 1913). Such knowledge and conduct, however, will not be imputed to a principal if its agent "is engaged in committing an independent fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act." *Am. Export & Inland Coal Corp. v. Matthew Addy Co.*, 147 N.E. 89, 92 (Ohio 1925); Restatement (Third) of Agency § 5.04 (2006) ("[N]otice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person."). This principle is known as the adverse interest exception. *First Nat'l Bank of New Bremen*, 103 N.E. at 94.

The adverse interest exception is not absolute, however. Pursuant to the sole actor doctrine, if the agents responsible for the adverse conduct are the officers or directors of the principal and those officers or directors "so dominated and controlled the [principal] that the [principal] had no separate mind, will, or existence of its own," then the officers and directors are

deemed the "alter egos" of the principal and "any malfeasance on their parts is directly attributable to the [principal]." *In re Dublin Sec.*, 133 F.3d at 380.

In determining that Durham and Cochran so dominated the Debtor as to trigger the sole actor doctrine, the district court emphasized that, in the amended complaint, the Trustee alleged that Durham and Cochran immediately began operating the Debtor as a fraudulent scheme and controlled all aspects of the Debtor's operations. *Bash*, 483 B.R. at 651–52. On appeal, the Trustee does not take issue with the district court's conclusion that Durham and Cochran dominated the Debtor. Appellant's Opening Br. 43. Rather, the Trustee reiterates that, "even if the 'sole actor' doctrine might otherwise apply here, it is subject to the 'innocent insider' exception, which exists if the company had at least one innocent decision-maker who could have stopped the wrongdoing if he or she had known of it." *Id.*

"The innocent insider exception is a corollary to the sole actor rule. . . . The touchstone of the innocent insider exception is control. If an innocent person inside the corporation had the power to stop the fraud, the agent and the company are not mere alter egos, so the sole actor rule cannot apply." *Unencumbered Assets, Tr. v. Great Am. Ins. Co.*, 817 F. Supp. 2d 1014, 1036 (S.D. Ohio 2011) (quoting *McHale v. Citibank, N.A. (In re 1031 Tax Grp., LLC)*, 420 B.R. 178, 202 (Bankr. S.D.N.Y. 2009)); *see Gold v. Deloitte & Touche LLP (In re NM Holdings Co.)*, 411 B.R. 542, 549 (E.D. Mich. 2009) (explaining that "the presence of innocent decision makers is an indication that the sole actor rule should not apply because the wrongdoer was not really a sole actor"); *Cohen v. Morgan Schiff & Co. (In re Friedman's Inc.)*, 394 B.R. 623, 632–34 (S.D. Ga. 2008) (emphasizing "that the sole actor rule does not apply if innocent decision-makers could have stopped the fraudulent activity"); *Midwest Mem'l Grp. LLC v. Citigroup Global Mkts. Inc.*, No. 322338, 2015 WL 5519398, at *11 (Mich. Ct. App. Sept. 17, 2015) (unpublished) ("For the existence of an innocent decision-maker to preclude application of the sole actor rule, there must exist[] at least one innocent decision maker who, if he had been alerted to the fraud, could have stopped it." (alteration in original) (internal citation and quotation marks omitted)); *Glenbrook Capital Ltd. P'ship v. Dodds (In re Amerco Derivative Litig.)*, 252 P.3d 681, 696 (Nev. 2011) (concluding that the presence of innocent insiders is relevant in assessing whether a sole actor exists sufficient to overcome the adverse interest exception); *O'Halloran v.*

*PricewaterhouseCoopers LLP*, 969 So.2d 1039, 1045 (Fla. Dist. Ct. App. 2007) (noting that "the presence of any innocent decision-maker in the management of a corporation can provide the basis for invoking the adverse interest exception, preventing the imputation of wrongdoing and defeating the use of the *in pari delicto* defense against the corporation").

In ruling on the motion to dismiss, the district court correctly noted that no Ohio court has adopted or otherwise directly addressed whether the existence of an innocent decision maker or insider would preclude the application of the sole actor doctrine. *Bash*, 483 B.R. at 652. However, the district court went on to conclude that, regardless of whether Ohio would embrace an innocent insider exception to the sole actor doctrine, "the [amended] complaint is completely devoid of any allegations regarding innocent insiders or any control they may have exerted over the [D]ebtor." *Id.* Thus, the district court concluded that the innocent insider exception was inapplicable, the adverse interest exception to imputation was negated by the sole actor doctrine, and, upon imputing Durham and Cochran's wrongful conduct to the Debtor, the Trustee's civil conspiracy claim was barred by the *in pari delicto* defense.

In reaching these conclusions, however, the district court failed to give heed to a basic principle of federal civil procedure: a plaintiff is not required to plead facts necessary to defeat an affirmative defense. *See Frank v. Dana Corp.*, 646 F.3d 954, 963 (6th Cir. 2011) (concluding that, because good faith was an affirmative defense to a claim under § 20(a) of the Securities and Exchange Act of 1934, the district court erred in requiring the plaintiff to plead that the defendants did not act in good faith). As the Supreme Court has explained,

> A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief. If the allegations, for example, show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim; that does not make the statute of limitations any less an affirmative defense. Whether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground, not on the nature of the ground in the abstract.

*Jones v. Bock*, 549 U.S. 199, 215–16 (2007) (holding "that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints"). Accordingly, we conclude that the district court erred when it

dismissed the Trustee's civil conspiracy claim based in part on its determination that the Trustee had failed to plead facts demonstrating the existence of an innocent insider, which the district court assumed, for purposes of its decision, would potentially defeat Textron's affirmative *in pari delicto* defense.

Although the district court expressed no opinion as to whether the Ohio Supreme Court would adopt the innocent insider exception to the sole actor doctrine, this litigation's prolonged procedural history necessitates that we venture an "*Erie* guess" in the name of judicial efficiency, and we conclude that the Ohio Supreme Court would adopt the innocent insider exception to the sole actor doctrine. Ohio has long followed the sole actor doctrine. *See First Nat'l Bank of New Breme*n, 103 N.E. at 96. Although no Ohio court appears to have decided whether to apply the innocent insider exception to that doctrine, *see Unencumbered Assets, Tr.*, 817 F. Supp. 2d at 1036, the innocent insider exception is a corollary that flows ineluctably from the agency principles that underlie the sole actor doctrine.

The United States District Court for the Southern District of New York has described why this is the case. The adverse interest exception to the *in pari delicto* doctrine applies "the fiction of imputation" by asking "whether the knowledge of the agent that is to be imputed to the principal was gained within, or outside of, the scope of agency." *In re CHI Holding Co.*, 311 B.R. 350, 373 (S.D.N.Y. 2004), *aff'd in part and rev'd in part*, 529 F.3d 432 (2d Cir. 2008). "Even when an agent is defrauding his principal, unless the agent has totally abandoned the interests of the principal and is acting entirely in his own, or another person's, interest, that agent is acting within the scope of his agency." *Id.* The sole actor doctrine is based on the recognition that, when a particular agent or set of agents "are one and the same" as the principal, "it would be nonsensical to refrain from imputing the agent's acts of fraud to the corporation, despite the agent's total abandonment of the corporation's interests, because the agent is identical to the corporation." *Id.* (internal quotation marks omitted). But, "when the innocent insiders possessed authority to stop the fraud, the 'sole actor rule' does not apply, because the culpable agents who had totally abandoned the interests of the principal, and were thus acting outside the scope of their agency, were not identical to the principal." *Id.* In other words, a set of agents cannot be said to be the *sole* actor who is one and the same as the principal when others exist within the

principal who had sufficient authority to stop the fraud had they known of it.  Accordingly, we hold that the Ohio Supreme Court, if given the chance, would apply the innocent insider exception to the sole actor doctrine.

3.

Finally, we turn to Textron's contention that the Trustee's civil conspiracy claim is time barred.  Under Ohio law, "the applicable statute of limitations for filing a civil conspiracy [claim] is the relevant limitations statute for the underlying cause of action." *Davis v. Clark Cty. Bd. of Comm'rs*, 994 N.E.2d 905, 909 (Ohio Ct. App. 2013).  Here, the Trustee alleges that Textron conspired with Durham to defraud the Debtor.  Accordingly, for the claim to be timely, it must have been filed within four years of the date that the Debtor first discovered or should have discovered the fraud.  *Inv'rs REIT One*, 546 N.E.2d at 209–10.  Recognizing that Durham and Cochran perpetrated the fraud in the Debtor's name, the Trustee does not assert that the Debtor was unaware of the fraud.  Appellant's Reply Br. 29.  Rather, the Trustee argues that the doctrine of "adverse domination" applies to equitably toll the four-year statute of limitations because the directors and officers are unlikely to initiate actions or investigations into fraudulent conduct when such actions or investigations would reveal their own wrongdoing.  *Id.*

The Ohio Supreme Court has yet to expressly address the adverse domination doctrine in any context, and in December 2015, the court declined to answer a certified question from this court as to whether Ohio would "apply the doctrine of adverse domination to toll the statute of limitations provided by Ohio Rev. Code § 2305.09 for a claim of breach of fiduciary duty brought against a director or officer of an Ohio corporation." *Antioch Co. Litig. Tr. v. Morgan*, 633 F. App'x 296, 302 (6th Cir. 2015); *Antioch Co. Litig. Tr. v. Morgan*, 45 N.E.3d 242 (Ohio 2016).  As a result, on March 24, 2016, the Sixth Circuit ventured in a nonprecedential decision an "*Erie* guess" as to whether the Ohio Supreme Court would adopt the adverse domination doctrine to toll or extend the statute of limitations for a breach of fiduciary duty claim and answered the question in the negative. *Antioch Co. Litig. Tr. v. Morgan*, -- F. App'x --, No. 14-3790, 2016 WL 1161233, at *1–3 (6th Cir. Mar. 24, 2016) (unpublished).  In so doing, the Court emphasized two points.  First, the Court noted that "[t]he Ohio Court of Appeals has twice rejected adverse domination as generally lacking support in Ohio's statutes and judicial

decisions."[15] *Id.* at *2. Next, the Court underscored that "other courts considering the question of adverse domination have focused on whether state law would apply a discovery rule to the relevant claim for purposes of the statute of limitations" and explained that, because Ohio's legislature only provided a limited discovery rule for those § 2305.09 actions grounded in fraud and conversion, "the Ohio Supreme Court has declined to expand application of the discovery rule" to other torts arising under § 2305.09, including claims for breach of fiduciary duty. *Id.* at *3.

*Antioch Co. Litigation Trust* is an unpublished decision lacking precedential authority. *Mfrs.' Indus. Relations Ass'n v. E. Akron Casting Co.*, 58 F.3d 204, 208 (6th Cir. 1995); *United States v. Williams*, 15 F.3d 1356, 1363 n.6 (6th Cir. 1994). So while we find benefit in thoughtfully considering the Court's analysis, we are not bound by the decision. We do note, however, that while we conclude that the Ohio Supreme Court, if presented with this issue, would apply the doctrine of adverse domination to toll the statute of limitations provided by Ohio Rev. Code § 2305.09 for a claim of fraud, our decision is in line with the thrust of this Court's analysis in *Antioch Co. Litigation Trust*.

As the Court in *Antioch Co. Litigation Trust* explained, when considering whether state law would embrace the adverse domination doctrine to toll or extend a cause of action's statute of limitations, other courts "have focused on whether state law would apply a discovery rule to the relevant claim for purposes of the statute of limitations." *Id.* at *2. Courts routinely look to a state's application of the discovery rule when considering the doctrine of adverse domination because "adverse domination shares the same theoretical underpinnings as the discovery rule." *Id.* at *2 (quoting *Wilson v. Paine*, 288 S.W.3d 284, 287 (Ky. 2009)). The discovery rule operates in many jurisdictions to toll the statute of limitations for certain tort claims until the plaintiff discovers or, upon the exercise of reasonable diligence, could discover that she has been injured by the wrongful conduct of another. *See, e.g.*, *Alexander v. Sanford*, 325 P.3d 341, 353–54 (Wash. Ct. App. 2014); *Wilson*, 288 S.W.3d at 286–87; *Resolution Tr. Corp. v. Grant*, 901

---

**15**As noted by the dissent in *Antioch Co. Litigation Trust*, however, these two opinions, written sixty years apart, come from one of Ohio's twelve intermediate appellate courts and provide little in the way of analysis or precedential support. *Id.* at *5 (Moore, J., dissenting). Moreover, neither case addressed the application of the adverse domination doctrine to claims of fraud. Accordingly, they are of limited value in assessing the issue before us.

P.2d 807, 813–14 (Ok. 1995); *Clark v. Milam*, 452 S.E.2d 714, 718 (W.Va. 1994).  And most courts have "uniformly embraced adverse domination" as a natural extension of a state's discovery rule, *Wilson*, 288 S.W.3d at 288, tolling a cause of action's statute of limitations because, when controlled by culpable directors, a corporate plaintiff will be unable to "independently acquire the knowledge and resources necessary to bring suit," *id.* at 288 (quoting *Hecht v. Resolution Trust Corp.*, 635 A.2d 394, 504 (Md. 1994)).  *See Alexander*, 325 P.3d at 354; *FDIC v. Smith*, 980 P.2d 141, 145–46 (Or. 1999); *Grant*, 901 P.2d at 813–14; *Clark*, 452 S.E.2d at 718.

Here, the Ohio legislature has expressly set forth a limited discovery rule for purposes of § 2305.09, providing that, if an action under § 2305.09 "is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered." § 2305.09.  In light of this mandate, the Ohio Supreme Court has explained that, in fraud cases, "the date of discovery [will] toll the running of the governing statute of limitations until the plaintiff discovers or, in the exercise of reasonable care, should have discovered the complained-of injury." *Inv'rs REIT One*, 546 N.E.2d at 210.  Accordingly, because the Ohio legislature expressly provided for a discovery rule in actions sounding in fraud and because the adverse domination doctrine is "merely a corollary of . . . [the] discovery rule," *Wilson*, 288 S.W.3d at 288, giving credence to the basic principle that knowledge of a cause of action is meaningless unless it is coupled with an ability to act, we conclude that the Ohio Supreme Court, if presented with this issue, would apply the doctrine of adverse domination to toll the statute of limitations provided by Ohio Rev. Code § 2305.09 for a claim of fraud.

Thus, because the four-year statute of limitations was tolled pursuant to the adverse domination doctrine until the FBI raided the Debtor and the Debtor, for the first time, possessed knowledge of Durham, Cochran, and Textron's alleged wrongdoing and the ability to act on that knowledge, we conclude that the Trustee's civil conspiracy claim is timely.

C.

A brief word is in order as to the district court's dismissal of the Trustee's equitable subordination and disallowance claims. The district court exclusively rested its *sua sponte* dismissal of the Trustee's equitable subordination and disallowance claims on its dismissal of the Trustee's underlying substantive claims. Accordingly, because we reverse the district court in part and remand for further proceedings on the Trustee's actual fraudulent transfer and civil conspiracy claims, we also reverse the district court's dismissal of the Trustee's equitable subordination and disallowance claims.

III.

For the reasons set forth above, we **REVERSE** the district court's dismissal of the Trustee's actual fraudulent transfer, civil conspiracy, and equitable subordination and disallowance claims, and we **AFFIRM** the district court's dismissal of the Trustee's constructive fraudulent transfer claim.