Vance M. THOMPSON, Elizabeth T. Russell, H. Ripley Thompson, John G. Thompson, Ruth T. Trammell, Vance M. Thompson, Jr., William H. Thompson, a Partnership, d/b/a The Summit House Apartments, Appellants,

v.

UNITED STATES of America, Appellee.

M. D. THOMPSON AND SON CO., Appellant,

v.

J. H. COTTRELL, Receiver, and United States of America, Appellee.

Nos. 19131 and 19132.

United States Court of Appeals Eighth Circuit.

Feb. 27, 1969.

---

Wayne W. Owen, Little Rock, Ark., filed brief of appellants.

W. H. McClellan, U. S. Atty., Little Rock, Ark., filed brief of appellees; J. Winston Bryant and Walter G. Riddick, Asst. U. S. Attys., were on the brief with W. H. McClellan, Little Rock, Ark.

Before MATTHES, GIBSON and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

These appeals arise from controversies which developed from the financing and operation of The Summit House Apartments in Little Rock, Arkansas. The "Summit House Apartments" is also the name of a partnership made up of Vance M. Thompson of McCrory, Arkansas, and his adult sons (the "Thompsons" or the "Thompson partnership"). The government as holder of security interests in real and personal property of those apartments foreclosed against the Thompsons. In Appeal 19131, the Thompsons as appellants take issue with the rulings of the United States District Court for the Eastern District of Arkansas, reported in part at 272 F.Supp. 774, which (a) dismissed their counterclaim (as defendants below) against the government;[1] (b) awarded the government a judgment in personam for $72,-931.78 against the Thompsons for unauthorized appropriation of rental funds of the apartments; and (c) authorized a foreclosure decree to include certain furniture placed in the apartments by the Thompsons. In Appeal 19132, the appellant is M. D. Thompson and Son Co. (the "Thompson corporation" or the "corporation") of which Vance Thompson is an officer and his wife, his adult children and his grandchildren are all stockholders. The corporation as plaintiff below sought unsuccessfully to establish that it held a security interest ahead of the government's in the furniture. The actions were consolidated for trial before the district court. We affirm for the reasons stated herein. The facts are detailed in the reported opinions of the district court and we limit our recitation of the facts to those essentials necessary for consideration of the issues presented.

In 1962, Paul Kapelow and Lester Gross constructed the Summit House Apartments, a high-rise building in Little Rock, with the aid of a one hundred per cent construction loan of $3,-100,800.00 from the John Hancock Mutual Life Insurance Company ("John Hancock"). The loan was guaranteed in full by the Federal Housing Administration (FHA) and was secured by a deed of trust[2] (also referred to as a mortgage) on the property. Kapelow and Gross agreed to be bound by an FHA "regulatory agreement", which included, *inter alia*, a restriction on their right to disburse funds from the income of the mortgaged property.[3] The note, deed of

---

1. The trial court's opinion dismissing the counterclaim of the defendant Thompsons is reported at 293 F.Supp. 1307 (E.D. Ark.1967).

2. The trustee under the deed of trust was Robert C. Jordan, trustee for John Hancock, who was made a nominal party to the proceedings below.

3. The following provisions of the regulatory agreement are pertinent to this controversy:

   "6. Owners shall not without the prior written approval of the Commissioner:
   (a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property;
   (b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from 'surplus cash', except for reasonable operating expenses and necessary repairs;
   *   *   *   *   *

   (d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project;
   (e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except 'surplus cash' and except on the following conditions:
   *   *   *   *   *
   (2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the Note or Mortgage;
   *   *   *   *   *
   7. (g) All rents and other receipts of the project shall be deposited in the name of the project in a bank whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of this agreement for expenses of the project or for distributions of surplus cash. Any owner receiving funds of the proj-

trust, and regulatory agreement were all recorded in the real estate records in the office of the Circuit Clerk and Recorder of Pulaski County (Little Rock), Arkansas.

While the apartments were under construction, Kapelow and Gross conveyed their interest in the premises to the Thompson partnership. On November 4, 1963, the Thompsons assumed the obligations of the deed of trust and regulatory agreement with the written understanding that no personal liability was assumed by them for payments due under the note and deed of trust. But the

agreement further provided that the Thompsons would remain liable

"(a) For funds or property of the project coming into its hands which, by the provisions thereof, it is not entitled to retain; and

(b) For its own acts and deeds, or acts and deeds of others which it has authorized in violation of the provisions thereof."

The Thompsons, as of October 1, 1965, defaulted in installment payments called for under the deed of trust note. Thereafter, FHA made good its guarantee to John Hancock and John Hancock as-

---

ect other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this agreement shall hold such funds in trust. Any owner receiving property of the project in violation of this agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust.

\* \* \* \* \*

10. Upon a violation of any of the above provisions of this Agreement by Owners, the Commissioner may give written notice, thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Commissioner, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Commissioner within 15 days after the date such notice is mailed or within such further time as the Commissioner determines is necessary to correct the violation, without further notice the Commissioner may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Commissioner may:

\* \* \* \* \*

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the mortgagor's obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

\* \* \* \* \*

(d) Apply to any court, state or Federal, for specific performance of

this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Commissioner arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

12. As used in this Agreement the term:

\* \* \* \* \*

(e) 'Mortgaged Property' includes all property, real, personal, or mixed covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Commissioner;

(f) 'Project' includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, such business being the furnishing of housing and such other activities as are incidental thereto;

(g) 'Surplus Cash' means any cash remaining after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Federal Housing Commissioner;

\* \* \* \* \*

(h) 'Distribution' means any withdrawal or taking of cash or other assets of the project other than for mortgage payments or for repayment of reasonable expenses incident to its operation and maintenance; \* \* \*"

signed its security interests to the Federal Housing Commissioner. On April 4, 1966, the United States, on behalf of the Federal Housing Commissioner, brought a foreclosure action against the Thompson partnership and sought a decree authorizing sale of both real and personal property held as collateral under the deed of trust note. Pursuant to the deed of trust, an operating receiver was appointed. Subsequently, the government amended its complaint in foreclosure to include the allegation that the Thompsons had misappropriated funds of the project. The Thompsons counterclaimed under the provisions of the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, seeking damages of $494,530.40 and alleging, in substance, that the entire Summit House project was tainted with fraud and deceit upon the Thompsons and that the FHA had been a party to such conduct.

On February 11, 1966, more than four months following the default by the Thompsons, the Thompson partnership executed a security agreement in favor of the Thompson corporation on furniture, such as beds, tables, chairs, sofas, and the like, which was being used in various apartments in the Summit House and which had been purchased during 1964 and 1965 by the Thompsons through the Thompson corporation, a mercantile firm dealing in furniture as well as other merchandise. A financing statement covering such furniture was properly filed under the provisions of the Uniform Commercial Code in effect in Arkansas. While the foreclosure action was pending in federal court, the Thompson corporation commenced an action in the Chancery Court of Pulaski County, Arkansas, against J. H. Cottrell, the federal receiver, and the members of the Thompson partnership to establish a first lien on that furniture. This action was removed to federal court and was consolidated for trial with the FHA foreclosure, with the United States as intervenor.

The trial court's decree foreclosed the government's interest against the real estate and appliances, which appellants concede was proper, and also held the Thompsons personally liable for unauthorized withdrawals from the funds of the project and for use of rental proceeds contrary to the terms of the regulatory agreement. The court further determined that the security interest of the government in the furniture, pursuant to an after-acquired property clause in the deed of trust, was superior and prior to the security interest of the Thompson corporation.

### (1) UNAUTHORIZED WITH-DRAWALS.

The trial court found the Thompsons, during the months subsequent to default on October 1, 1965, made several unauthorized withdrawals from the rental income of the project as follows:

(a) The partnership transmitted $13,000.00 to a firm of attorneys in Little Rock, Arkansas, to apply on an account owed by the Thompsons for legal services rendered in connection with the original acquisition of the property, the settlement of labor and materialmen lien claims and the final closing of the construction loan. The Thompson partnership attempted to justify such withdrawal as a reasonable operating expense.

(b) The partnership paid $14,931.78 out of the rental proceeds to the Worthen Bank & Trust Company for payment of a loan earlier made to the partnership. The trial court found that the partnership had turned the proceeds of the loan over to the Southwest Leasing Corporation, a lessee of part of the Summit House building. The lessee used these funds to purchase furniture and equipment to equip the leased premises as a private club. The trial court found that the expenditure was in the nature of a capital investment and was not for reasonable operating expenses or for necessary repairs.

(c) On April 11, 1966, a week after the government had filed its complaint for foreclosure and a few days before a receiver had been appointed, the part-

nership drew a check in the amount of $45,000.00 from the bank account containing the rental proceeds of the project. These funds were personally received and used by Vance Thompson. The Thompsons attempted to justify such withdrawal as a recoupment of part of the funds they had contributed to the project's operating account. The partners claim that, since they were not personally liable for the mortgage indebtedness, they ought to be able to reimburse themselves from the partnership bank account for their prior contributions. The record indicates that, since rentals were not sufficient to cover all expenses, the partners had contributed approximately $118,000.00 in operating funds to the project. Prior to default, the Thompsons had made withdrawals of about $60,000.00. They claim that they were actually entitled to recoup funds in addition to this amount and the later $45,-000.00 withdrawal. They do not, however, contest the trial court's specific finding that the account from which the withdrawals had been made "on and after October 1, 1965, had nothing in it except rental income and tenants' deposits". That finding strikes a fatal blow to the efforts of the Thompsons to trace their earlier contributions to that account.

All parties agree that the regulatory agreement governs the Thompsons' right to disburse funds from the rental proceeds. Chief Judge Henley rightly found that the partnership account had no "surplus cash" after default and that only "operating expenses" were authorized to be paid out of that account, the scope of which he construed as follows:

> "The contract documents do not define the term 'operating expenses,' and it is a term which probably has no fixed, precise or inflexible meaning. Regard must be had to the context in which the term is used and to the nature of the business under consideration. In present context the Court is convinced

that the term must be construed with at least reasonable strictness and that the concept of 'operating expenses' should be limited to expenses paid or incurred in connection with the actual operation of the Summit House as a going concern. Capital expenditures should be excluded, of course, and the Court thinks that there should be excluded also expenses paid or incurred in connection with readying the project for operation." 272 F.Supp. at 787.

The trial court further correctly noted that:

> "While the partnership was not required to advance funds to the project, it is clear that in the absence of such advances the project would never have been able to get off the ground. The advances were made by the partnership not to protect the insurance company or the Government or to enhance the security but to promote the interests and expectations of the partners. The Government never guaranteed the partnership that the Summit House operation would be successful or profitable, and the Government never assumed the risk of loss should the project fail, except that the Government was willing to insure a loan which had for its security only the property itself, there being no personal recourse against the borrower." *Ibid.*

■ We agree with the trial court that the government was entitled to a judgment against the Thompsons for the unauthorized withdrawals. Neither the payment for attorneys' fees incurred in the acquisition of the project nor the repayment of the bank loan, the proceeds of which were used to equip and furnish part of the premises for a private club, nor the withdrawal of funds to reimburse any of the partners for prior advances to the operating account constituted payment of reasonable expenses incidental to the operation and maintenance of the project.[4] To interpret the

---

4. Provisions of the regulatory agreement, *supra*, footnote 3, prohibit payment of project funds, other than surplus cash, except for reasonable operating expenses and necessary repairs.

language of the regulatory agreement to validate these withdrawals would deny the claim of the party having security in the assets of the project in favor of defaulting entrepreneurs who happened to have immediate control over the checkbook.

### (2) DISMISSAL OF COUNTERCLAIM.

■ The Thompsons also contest the dismissal of their counterclaim against the United States in which they alleged, in substance, fraud and misrepresentation on the part of the FHA which allegedly resulted in Kapelow and Gross "being able to foist off upon the Partnership this unworkable, unfit and faulty-constructed Project". The trial court based the dismissal of this counterclaim on jurisdictional grounds, noting that the Federal Tort Claims Act, 28 U.S.C. § 2680(h),[5] specifically precludes actions against the United States based on misrepresentation or deceit and, if the pleading be construed to present a claim sounding in contract for an amount in excess of $10,000.00, the action can only be brought in the Court of Claims, 28 U.S.C. § 1346(a) (2).[6] The trial court's dismissal is clearly in accord with the plain meaning of these statutes. United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961). We adopt the opinion of the trial court on this issue.

### (3) PRIORITY AGAINST FURNITURE

The government's claim to a prior interest in the furniture, even though the furniture was placed in the premises after the real estate mortgage had been executed and filed, is predicated on the after-acquired property clause in the deed of trust covering personal property of the partnership which might be used in and about the Summit House building including all goods and chattels that might be furnished in its operation. The trial court determined that the after-acquired property clause in the deed of trust gave the trustee a security interest in these chattels on behalf of the government. In determining that the government's interest under this clause was prior to the security interest of the Thompson corporation, the trial court said:

> "Certainly the furniture dealings between the corporation and the partnership do not appear to have been arms' length transactions carried out as such transactions usually are between a seller and a buyer of goods having a total price of more than $100,000.
>
> \* \* \* \* \* \*
>
> [T]he Court is persuaded that the corporation, through Mr. Thompson, had actual knowledge of the contents of the deed of trust. Mr. Thompson will not be heard to say that he did not know what the deed of trust said about furniture, and what Mr. Thompson knew the corporation knew.
>
> \* \* \* \* \* \*
>
> [T]here was no real conflict of interest between the two Thompson enterprises. It seems clear to the Court that the method of acquiring the fur-

---

5. 28 U.S.C. § 2680(h) provides:
   "The provisions of this chapter and section 1346(b) of this title shall not apply to
   \* \* \* \* \*
   (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

6. 28 U.S.C. § 1346(a) (2) provides:
   "(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

   \* \* \* \* \*
   (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

niture which the parties employed was adopted purely as a matter of convenience and probably because the corporation might have been able to buy for better prices or on better terms than could the partnership.

\* \* \* \* \* \*

Here we have a family corporation and a family partnership without any really conflicting interests; Mr. Thompson dominates both. When due weight is given to all of the facts and circumstances here present, we think that the knowledge of Mr. Thompson as a partner is the knowledge of the corporation as far as the furniture is concerned.

The Court holds, therefore, that the Government's lien covers the furniture, and that it is valid as to the corporation. The Government's lien is also prior to that of the corporation because the corporation's financing statement was not filed contemporaneously with the delivery of the furniture or within ten days after such delivery. \* \* \* Hence, the Government will prevail with respect to the furniture." 272 F.Supp. at 782–783.

The government would sustain the court's conclusion and would justify its priority on § 85–9–401(2) [7] of the Uniform Commercial Code. Ark.Stat.Ann. § 85–9–401(2).[8] It contends that the recording of the deed of trust in the Pulaski County real estate records and the knowledge by the corporation of the after-acquired property clause in that instrument brings its interest within the protective ambit of Code § 85–9–401(2). It is suggested that the filing by the government's predecessor in interest was made in good faith though in an improper place and is effective against any person having knowledge thereof.

No Arkansas authority [9] has been advanced by the government to support this proposition and the applicability of § 85–9–401(2) in the present case is not clear in any of the jurisdictions now embracing the Code.[10] The government's argument is weakened by the fact that the deed of trust covering after-acquired property, which was filed in the real estate records, did not qualify as a financing statement under the Code because it was not signed by both the debtor and the secured party. Ark.Stat. Ann. § 85–9–402(1). Furthermore, there was apparently no attempt to comply with Code filing requirements relating to personal property. See, In Re King Furniture City, Inc., 240 F.Supp. 453, 457 (E.D.Ark.1965); Official Com-

7. Subsection (2) reads:
"A filing which is made in good faith in an improper place or not in all of the places required by this section is nevertheless effective with regard to any collateral as to which the filing complied with the requirements of this Article [chapter] and is also effective with regard to collateral covered by the financing statement against any person who has knowledge of the contents of such financing statement."

8. The Uniform Commercial Code was adopted in Arkansas effective December 31, 1961. Title 85 has been assigned to the Uniform Commercial Code sections which are otherwise numbered the same as in the official text. Publishers Note, Ark.Stat.Ann., Vol. 7C. The Code sections are § 85–1–101 et seq.

9. Arkansas law applies as to the validity and construction of the various security instruments considered in this case. See generally, United States for Use and Benefit of Lichter v. Henke Construction Co., 157 F.2d 13 (8th Cir. 1946); Blair v. United States, 147 F.2d 840 (8th Cir. 1945); 1A Moore's Federal Practice ¶ 0.305[3], 0.321 (1965).

10. We note that United States v. Baptist Golden Age Home, 226 F.Supp. 892 (W. D.Ark.1964) relied upon by the government, is inapplicable. In that case, the security interest covering after-acquired property was properly perfected under pre-Code law (See, Compiler's Notes to Ark.Stat.Ann. § 85–9–101) whereas, in the present case, the filing of the government's interest did not comport with applicable Code requirements; and, the later conditional seller never perfected its interest whereas, in the present case, the Thompson corporation did properly file a financing statement on the furniture.

ment 5 to Ark.Stat.Ann. § 85–9–401. We feel it to be unnecessary for purposes of the present controversy to determine what interpretation is to be given § 85–9–401(2) under Arkansas law.

The Thompson corporation, relying on § 85–9–312(5) [11] and 85–9–301(1) (a)[12] argues that, since its interest was the first to be perfected under the Code, it takes priority over the security interest created by the deed of trust even though it had actual knowledge of this interest.[13] But there was more than "actual knowledge" of the government's interest. Vance Thompson and his children, as partners, assumed the deed of trust and regulatory agreement and they now seek to avoid that obligation through the use of a transaction with the Thompson family corporation.

11. Ark.Stat.Ann. § 85–9–312(5) reads in part:
"(5) In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsection (3) and (4) of this section), priority between conflicting security interests in the same collateral shall be determined as follows:
(a) in the order of filing if both are perfected by filing, regardless of which, security interest attached first under Section 9–204(1) [subsection (1) of § 85–9–204] and whether it attached before or after filing; * * *"

12. Ark.Stat.Ann. § 85–9–301(1) (a) reads:
"(1) Except as otherwise provided in subsection (2), an unperfected security interest is subordinate to the rights of
(a) persons entitled to priority under Section 9–312 [§ 85–9–312]; * * *."

13. The Thompson corporation was the first to file in accordance with the Code. Code § 85–9–312(5) (a) stipulates that, except as otherwise provided, priority between conflicting security interests depends on the order of filing. The Official Comment to § 85–9–312 reads:
"Example 2. A and B make non-purchase money advances against the same collateral. The collateral is in the debtor's possession and neither interest is perfected when the second advance is made. Whichever secured party first perfects his interest (by taking possession of the collateral or by filing) takes priority and it makes no difference whether or not he knows of the other interest at the time he perfects his own.
Subsection (5) (a) and (5) (b) both lead to this result. It may be regarded as an adoption, in this type of situation, of the idea, deeply rooted at common law, of a race of diligence among creditors. Subsection (5) (c) adds the thought that so long as neither of the interests is perfected, the one which first attached (i.e. under the advance first made) has priority. The last mentioned rule may be thought to be of merely theoretical interest, since it is hard to imagine a situation where the case would come into litigation without either A or B having perfected his interest. If neither interest had been perfected at the time of the filing of a petition in bankruptcy, of course neither would be good against the trustee in bankruptcy."
Code § 85–9–301 incorporates Code § 85–9–312(5) (a) as to claims of a party, having an unperfected security interest, against the holder of a perfected security interest. Comment 2 to Code provision 85–9–301 clarifying the interrelation between that section and § 85–9–312 reads:
"Section 9–312 states general rules for the determination of priorities among conflicting security interests and in addition contains a list of other sections which state special rules of priority in a variety of situations. The interests given priority under Section 9–312 and the other sections therein listed take such priority in general even over a perfected security interest. A *fortiori* they take priority over an unperfected security interest, and subsection (1) (a) of this Section so states."
Generally, notice of a pre-existing, unperfected lien is immaterial under the Code. Bloom v. Hilty, 427 Pa. 463, 234 A.2d 860 (1967). For a general review of the field, see Felsenfeld, *Knowledge as a Factor in Determining Priorities under the Uniform Commercial Code*, 42 N.Y.U.L.Rev. 246 (April 1967).

■ By entering into a security agreement with each other, the Thompson partnerhip and the Thompson corporation were required to each exercise good faith in the enforcement of the security agreement on the furniture. To attempt to enforce that security agreement against the government, in our judgment, would be an act of extreme bad faith on the part of those members of the Thompson family who are affiliated with both the partnership and the corporation and particularly on the part of Vance Thompson, who dominated and acted for both business entities. Uniform Commercial Code § 85-1-203, which reads:

"Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." [14]

prevents the Thompson corporation from enforcing the security agreement against the government. In the regulatory agreement, Vance Thompson and his adult sons, as members of the partnership, had agreed that they would not, without the approval of the FHA Commissioner, encumber any of the mortgaged property or permit the encumbrance of any such property. The execution of the security agreement with the corporation was a breach of the regulatory agreement. The relationship between the Thompson partnership and the Thompson corporation is so close that the corporation must be charged with participation in the partnership's breach of the regulatory agreement.

We hold that Code § 85-1-203 permits the consideration of the lack of good faith by the Thompson entities toward the government to alter priorities which otherwise would be determined under Article 9. See French Lumber Co. v. Commercial Realty & Finance Co., 346 Mass. 716, 195 N.E.2d 507 (1964); Felsenfeld, Knowledge as a Factor in Determining Priorities under the Uniform Commercial Code, 42 N.Y.U.L.Rev. 246, 276 (1967); Coogan, Article 9 of the Uniform Commercial Code: Priorities Among Secured Creditors and the "Floating Lien", 72 Harv.L.Rev. 838, 859 (1959). See also, 1 Coogan, Hogan & Vagts, Secured Transactions under the Uniform Commercial Code, 177, n. 26 (1963). This seems to be in accord with the intention of the framers of the Code, as noted in the Official Comment to § 85-1-203:

"This section sets forth a basic principle running throughout this Act. The principle involved is that in commercial transactions good faith is required in the performance and enforcement of all agreements or duties. * * * The concept, however, is broader than any of these illustrations and applies generally, as stated in this section, to the performance or enforcement of every contract or duty within this Act. * * *" [15]

The simple fact is that Vance Thompson, in particular, in his domination of both the partnership and the corporation used these entities to breach the provisions of the regulatory agreement. His actions and the actions of the Thompson corporation could well have been tortious interferences in the contract rights of the government. See, Smith v. American Guild of Variety Artists, 368 F.2d 511 (8th Cir. 1966), cert. denied, 387 U.S. 931, 87 S.Ct. 2052, 18 L.Ed.2d 991 (1967); National Gas Appliance Corp. v. Manitowoc Co., 311 F.2d 896 (7th Cir. 1962); Tollett v. Mashburn, 183 F.Supp. 120 (W.D.Ark.1960), aff'd 291 F.2d 89

14. "Good faith", as defined in the Code, means "honesty in fact in the conduct or transaction concerned". Ark.Stat.Ann. § 85-1-201(19).

15. Official Comments to the Uniform Commercial Code are not binding upon the courts but they are persuasive in matters of interpretation and their counsel may help make the Uniform Commercial Code a truly national law. See, In re Yale Express System, Inc., 370 F.2d 433 (2nd Cir. 1966); National Cash Register Co. v. Firestone & Co., 346 Mass. 255, 191 N.E.2d 471 (1963).

(8th Cir. 1961); Southwestern Publishing Co. v. Ney, 227 Ark. 852, 302 S.W.2d 538 (1957).

Under the circumstances of this case, *good faith would require the members of the Thompson family and any of its business entities to observe and abide by these contractual agreements, and,* under § 85-1-203, the trial court was clearly correct in determining that the government was entitled to prevail in respect to this furniture.

### (4) THOMPSONS' RIGHT TO FURNITURE RENTALS.

The Thompsons also contend that they are entitled to the sum of $12,833.-45, such amount having allegedly been paid to the receiver as rentals on the Summit House furniture after the default but prior to foreclosure. The Thompsons argue that they were the owners of this furniture before the foreclosure and that the deed of trust note and regulatory agreement do not give the government an interest in these rentals. The trial court, in a supplemental opinion, rejected this contention by placing a broad construction on the provision in the deed of trust pledging the Summit House "rents" as collateral for the deed of trust note. We concur in the trial court's rejection of this claim and note that its holding is further strengthened by § 10(b) of the regulatory agreement which required the Thompsons to "[c]ollect *all rents and charges* in connection with the operation of the project and use such collections to pay the mortgagor's obligations under this Agreement and under the note and mortgage. * * *" (Emphasis added.) It is clear that under these agreements the government had a security interest in the furniture rentals and such rentals, together with other income of the project, were properly retained by the receiver to apply toward payment of the defaulted note.

Judgment affirmed.