RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

IN RE: FAIR FINANCE COMPANY,

*Debtor*,

─────────────────────────────────────────────

BRIAN A. BASH, Chapter 7 Trustee,

*Plaintiff-Appellant*,

*v.*

TEXTRON FINANCIAL CORPORATION,

*Defendant-Appellee*.

No. 20-3351

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Akron;
No. 5:12-cv-00987—Patricia A. Gaughan, District Judge.

United States Bankruptcy Court for the Northern District of Ohio;
No. 1:10-bk-50494—Jessica E. Price Smith, Judge; No. 1:12-ap-05101—Arthur I. Harris, Judge.

Argued: June 10, 2021.

Decided and Filed: September 10, 2021

Before: COLE, BUSH, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Daniel R. Warren, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellant. Mitchell A. Karlan, GIBSON, DUNN & CRUTCHER LLP, New York, New York, for Appellee. **ON BRIEF:** Daniel R. Warren, Scott C. Holbrook, Michael A. VanNiel, Jeremy S. Dunnaback, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellant. Mitchell A. Karlan, Lee G. Dunst, Nancy Hart, Timothy Sun, GIBSON, DUNN & CRUTCHER LLP, New York, New York, Quintin F. Lindsmith, BRICKER & ECKLER LLP, Columbus, Ohio, for Appellee.

---

**OPINION**

---

NALBANDIAN, Circuit Judge.　Can a party's later—arguably bad-faith—actions undermine its earlier perfected security interest so that payments made in connection with that security interest are fraudulent transfers under Ohio law?　That's the main question here.

Fair Finance Company entered into a $22 million revolving loan agreement with Textron Financial Corporation and another bank in 2002.　The agreement created, and Textron perfected, a security interest in all Fair Finance assets.

Around that same time, new owners (later convicted criminals) bought Fair Finance and began to run it into the ground by using the company to perpetuate a Ponzi scheme.　In 2003, Textron began to express concerns internally about what it thought was going on at Fair Finance. Regardless, when the revolver was set to expire in 2004, Textron and Fair Finance renewed and extended the revolver with conditions designed to protect Textron's interests.　But the other bank exited, and the remaining parties contracted for several alterations, including decreasing the revolver limit to $17.5 million.　The loan relationship ended in 2007 with Textron paid in full.

Not surprisingly, Fair Finance entered involuntary bankruptcy in 2010.　And the federal government later charged and convicted its owners of crimes in connection with the Ponzi scheme.

The bankruptcy trustee now seeks to avoid payments from Fair Finance to Textron as fraudulent transfers under Ohio's Uniform Fraudulent Transfer Act, Ohio Rev. Code § 1336.01, *et seq.* ("OUFTA").　The district court rejected the trustee's attempt to unwind the transfers.　The trustee appeals, arguing that the district court mistakenly rejected its arguments at summary judgment and erroneously instructed the jury at a trial on a related claim.　We **AFFIRM**.

I

A

At one time, Fair Finance was a legitimate Ohio factoring company—a company that buys discounted accounts receivable from merchants in exchange for immediate payment and then tries to collect the full amount. The company raised capital for accounts-receivable purchases by issuing debentures called V-notes.

But in 2002, Tim Durham and Jim Cochran bought the business and began using it to perpetrate a Ponzi scheme. Using V-note funds, the owners would pay off old investors and "loan" themselves and their other entities money.

Around the same time that Durham and Cochran bought the company, Textron and another bank entered a $22 million revolver with Fair Finance. The owners used revolver money to fund their factoring activities—a front for their fraudulent scheme.

When Textron entered the agreement and perfected its security interest, it did not know about the Fair Finance owners' scheme. But that soon changed. As early as 2003, Textron officials knew that Fair Finance was a "house of cards"; its related-party loans were "shaky at best"; use of debentures to fund those loans might be problematic based on Fair Finance representations about the use of those funds; and Fair Finance's financials reflected "one of the defining features of a Ponzi scheme," the "raising [of] new capital in order to pay off old investors." (R. 323-21, Infante Email, PageID 62552; R. 323-20, Giulioli Dep., PageID 62542.)

Yet Textron continued to loan money to Fair Finance. Not only did it continue to lend money, Textron sought to ensure that revolver money would stay out of Fair Finance's shaky loans. And it made a side deal with Fair Finance under which Fair Finance agreed to offset each new insider loan with an increase in V-note funding. When the revolver was set to expire in 2004, Textron and Fair Finance renewed, extended, and altered the revolver, allowing the other bank to exit and decreasing the revolver limit to $17.5 million. And Textron helped prevent public exposure of Fair Finance's precarious financial condition by doing things like waiving contractual provisions requiring audited financials and encouraging Fair Finance to inject more

insider-loan money into failing related entities to avoid forcing Fair Finance to write off those loans.

The loan relationship ended in 2007. Fair Finance paid Textron in full.

In 2009, Fair Finance's Ponzi scheme was exposed. *See United States v. Durham*, 766 F.3d 672, 676 (7th Cir. 2014) (criminal appeal); *see also United States v. Durham*, 630 F. App'x 634 (7th Cir. 2016) (order). And Fair Finance was forced into involuntary bankruptcy. *Durham*, 766 F.3d at 676.

B

Fair Finance's bankruptcy trustee brought an adversary proceeding against Textron. He sought to avoid millions of dollars in transfers to Textron under the revolver agreement as fraudulent transfers under OUFTA. That act creates an avenue for unwinding fraudulent transfers of "assets," but it excludes property encumbered by a valid lien from the definition of asset. Ohio Rev. Code §§ 1336.01(B), 1336.01(L), 1336.04(A).

Relying on its 2002 security interest, Textron moved to dismiss under Rule 12(b)(6) for failure to state a claim. The district court granted Textron's motion. It concluded that Fair Finance's payments to Textron did not qualify as "transfers" under OUFTA because the 2002 agreement created a valid security interest that encumbered the transferred funds, survived the non-novation 2004 modifications, and was unaffected by Textron's troubling post-lien-creation conduct. It also rejected the argument that the trustee could avoid as fraudulent the new "obligations" incurred by Fair Finance when some aspects of the loan relationship shifted in 2004.

The trustee appealed and prevailed. *Bash v. Textron Fin. Corp.* (*In re Fair Fin. Corp.*), 834 F.3d 651 (6th Cir. 2016). We held that there was an unresolved factual question about whether the 2004 agreement modifications were a novation that extinguished the 2002 agreement and security interest. *Id.* at 667-70. We remanded for the district court to revisit the novation question. *Id.* at 667. And we invited the district court to revisit the trustee's other theories for recovery on remand as well. *Id.*

On remand, the trustee argued that Textron's post-lien-creation bad faith could invalidate its 2002 security interest under OUFTA's definition of "valid lien." He also argued that he should be able to avoid the "new" obligations created by the 2004 agreement. And he argued that the 2004 agreement was a novation. The district court rejected the first two theories upon Textron's motion for summary judgment. And a jury rejected the trustee's novation argument. The trustee appealed again.

## II

The trustee now argues that we should reverse the district court's summary judgment decisions on his post-lien-creation-bad-faith argument and his new-obligation theory. We review those decisions de novo. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 373 (6th Cir. 2009).

He also argues that a jury instruction on novation contained a reversible error. We review "[t]he legal accuracy of jury instructions . . . de novo." *Smith v. Joy Techs., Inc.*, 828 F.3d 391, 397 (6th Cir. 2016). But a judgment may be reversed based on an improper jury instruction "only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008) (citation omitted).[1]

## III

Without the protection of a "valid lien," Fair Finance's loan repayments might be avoidable as fraudulent transfers under OUFTA. Ohio Rev. Code §§ 1336.01(B), 1336.01(L), 1336.04(A). But if a "valid lien" encumbered the transferred assets, then the payments are not avoidable. *Id.*

Transfers under the 2002 agreement were encumbered by a perfected security interest—a "lien" under OUFTA. Ohio Rev. Code § 1336.01(H) ("'Lien' means a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement . . . ."). But not all liens shield assets from avoidance. Only "valid" ones do. *Id.* §§ 1336.01(B), 1336.01(L), 1336.04(A). And the trustee contends that

---

[1]The trustee also raises an issue regarding how damages should be calculated if he prevails. But we don't reach that issue because we reject his liability arguments.

Textron's 2002 security interest is not a "valid lien" because Textron acted in bad faith after it learned about the Ponzi scheme. Because we disagree under OUFTA's definition of "valid lien," we reject that contention. The payments encumbered by the 2002 security interest are not avoidable.

A

Under the Bankruptcy Code, a "trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b)(2). OUFTA in turn makes fraudulent transfers—transfers made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor"—avoidable. Ohio Rev. Code § 1336.04(A). And "transfer" under OUFTA includes "every direct or indirect, absolute or conditional, and voluntary or involuntary method of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." *Id.* § 1336.01(L).

But the definition of "asset" creates an important carve-out from transfer's broad definition. Although "asset" "means property of a debtor," it "does not include . . . [p]roperty to the extent it is encumbered by a valid lien." *Id.* § 1336.01(B). And a "valid lien" is one that is "effective against the holder of a judicial lien subsequently obtained." *Id.* § 1336.01(M).

The outcome of the issue here turns on this final definition. If Textron's 2002 security interest is "effective against the holder of a judicial lien subsequently obtained," then the money paid is encumbered by a "valid lien" and falls outside the definition of "asset." *Id.* §§ 1336.01(B), 1336.01(M). Because "transfers" under OUFTA are limited to "asset" or asset-interest transfers, that would mean that the payments are not "transfers." And if the payments are not "transfers," they cannot be fraudulent ones. So if Textron's lien is valid, payments encumbered by the 2002 security interest fall outside the reach of the trustee's avoidance powers under 11 U.S.C. § 544(b)(2). But if the 2002 interest is not valid, then the payments are OUFTA "transfers" and thus potentially avoidable.

By measuring validity by referencing a dispute between two security interests, section 1336.01(M)'s valid-lien definition creates a hypothetical priority dispute between the interest

being tested (here, Textron's perfected interest) and "a judicial lien subsequently obtained." Ohio Rev. Code § 1336.01(M). In Ohio, chapter 1309 of Ohio's Uniform Commercial Code ("UCC") governs priority disputes. And that means "the Ohio UCC . . . determine[s] whether [a creditor has] a 'valid lien'" under OUFTA—one effective against a later judicial lien. *Thermo Credit, LLC v. DCA Servs., Inc.*, 755 F. App'x 450, 456 n.4 (6th Cir. 2018); *see Comer v. Calim*, 716 N.E.2d 245, 249 (Ohio Ct. App. 1998).

The UCC creates priority rules for ranking competing security interests, including a rule that dictates whether a security interest takes priority over a competing lien creditor's claim to collateral. And it imposes an overarching duty of good faith.

*The priority rules.* Under the UCC, "[c]onflicting perfected security interests . . . rank according to priority in time of . . . perfection." Ohio Rev. Code § 1309.322(A)(1). "A perfected security interest . . . has priority over a conflicting unperfected security interest . . . ." *Id.* § 1309.322(A)(2). And between two unperfected interests, the "first security interest . . . to attach . . . has priority." *Id.* § 1309.322(A)(3).

Lien creditor interests—whose priority is crucial to the OUFTA's definition of a valid lien—are treated the same way as perfected interests. So a "security interest . . . is subordinate to the rights of . . . a person who becomes a lien creditor before . . . the security interest . . . is perfected." *Id.* § 1309.317(A). Perfection is thus the key to determining priority between a creditor's security interest and a competing lien creditor. *See id.* If person A perfects a security interest before person B becomes a lien creditor, then person A's interest defeats person B's lien. *See id.* But if person A's interest is unperfected or becomes perfected after person B becomes a lien creditor, then person B's lien has priority over person A's interest. *See id.*

But here, the trustee adds some complexity to this relatively straightforward rule. He argues that if person A acts in bad faith after perfecting his security interest he, in some sense, forfeits his right to claim priority over person B—regardless of whether he directed his bad faith toward person B. He grounds this argument in the UCC's duty of good faith.

*Good faith.* The UCC "imposes an obligation of good faith" in the "performance and enforcement" of "[e]very contract or duty within" several UCC chapters, including the chapter

covering secured transactions. *Id.* § 1301.304. "'Performance and enforcement' of contracts and duties within the Uniform Commercial Code include the exercise of rights created by the Uniform Commercial Code." *Id.* cmt. 2.

The chapter governing secured transactions and priority disputes empowers courts to "order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions" "[i]f it is established that a secured party is not proceeding in accordance with this chapter." *Id.* § 1309.625(A). And the official comment says that the "principal limitations . . . on a secured party's right to enforce its security interest against collateral are the requirements that it proceed in good faith (Section 1-203), in a commercially reasonable manner (Sections 9-607 and 9-610)." *Id.* § 1309.625 cmt. 2. As the trustee points out, some courts (though none of Ohio's state courts) have used these provisions to reorder competing creditors' priorities in priority disputes. *See Gen. Ins. Co. of Am. v. Lowry*, 412 F. Supp. 12, 14 (S.D. Ohio 1976), *aff'd*, 570 F.2d 120 (6th Cir. 1978) (equitably reordering priorities because attorney had only perfected superior interest in collateral because he failed to turn over the collateral to the plaintiff as contemplated by an agreement that he was, as a party's attorney, fully aware of); *Farm Credit of Nw. Fla. v. Easom Peanut Co.*, 718 S.E.2d 590, 599 (Ga. Ct. App. 2011) (concluding that bad-faith misrepresentations to unsecured peanut farmers by a secured creditor of a bankrupt peanut broker about the broker's ability to pay farmers back could support reordering of priorities); *Affiliated Foods, Inc. v. McGinley*, 426 N.W.2d 646, 648 (Iowa Ct. App. 1988) (inducing party to enter sales transaction under false belief about priority level precluded enforcement of senior security priority).

B

The parties do not debate whether Textron acted inappropriately by knowingly propping up the Fair Finance Ponzi scheme. But the question here isn't whether Textron was a bad actor. The question is whether its actions would render its perfected interest "[in]effective against the holder of a judicial lien subsequently obtained" in a hypothetical UCC priority contest. Ohio Rev. Code § 1336.01(M). And the answer to that question is no, meaning Textron enjoyed a "valid lien" under OUFTA. This conclusion is grounded in the nature of the UCC's priority test as well as critical distinctions between normal priority disputes and the OUFTA valid-lien test.

The UCC's priority rules help answer only one question—priority among competing creditors. *See* Ohio Rev. Code §§ 1309.322(A), 1309.317(A). And that means two things. First, for the rules to provide an answer, there need to be at least two competing interests to rank (in normal circumstances, two actual creditors' interests). And second, the rules only provide a relative answer—priority relative to another interest being measured. The rules are *not* about validity. Priority contests only tell us where to rank a specific interest in relation to other specific interests.

These principles apply to section 1309.317(A)'s test for priority between a security interest and a lien creditor. Like the broader priority framework, to get an answer under section 1309.317(A), we need two competing claims to plug into the rule—a security interest and a competing creditor lien. Section 1309.317(A)'s test then tells us each party's relative priority. But because invalidation is not the object of the inquiry, resolution of the priority contest does not tell us anything about an interest's validity. *See id.* § 1309.317(A) (stating a "security interest . . . is *subordinate* to the rights of . . . a person who becomes a lien creditor before . . . the security interest . . . is perfected" (emphasis added)).

The UCC's good-faith provisions can impact the answer under the priority rules by limiting a bad-faith actor's ability to "enforce" its security-interest-priority rights created by the UCC. *Id.* § 1309.625(A) & cmt. 2. But the duty of good faith does *not* alter the question that the UCC priority rules answer—relative priority among competing interests. *See id.* §§ 1309.322(A), 1309.317(A). And as sweeping as that duty is, it only applies to the "'*performance and enforcement*' of contracts and duties" (including "rights created by the" UCC) under various UCC chapters. *Id.* § 1301.304 & cmt. 2 (emphasis added). That means that in the context of UCC priority rights, the only enforcement right that bad faith can impact is enforcement of a senior priority vis-à-vis a junior creditor's rights—a question of priority, not validity. *See id.*

Because of the nature of the right that the UCC priority rules create and the question they answer—priority between the actual competing interests disputing relative priority rather than validity—there is necessarily always a directional component to the good-faith reordering analysis. *See, e.g.*, *Affiliated Foods*, 426 N.W.2d at 648 (inducing party to enter sales transaction

under false belief about priority level precluded enforcement of senior security priority against junior interest). The question is not whether a party's bad faith in some abstract sense justifies invalidation. The question is whether as between two or more specific competing creditor interests, a junior interest should jump in line. Or otherwise stated, whether a senior interest should be allowed to enforce its senior interest by "exercis[ing] [priority] rights created by the Uniform Commercial Code." Ohio Rev. Code § 1301.304 cmt. 2; *see id.* § 1301.304 & cmt. 2 (requiring good faith in enforcement of rights under the UCC); *id.* § 1309.625 cmt. 2 ("The principal limitations . . . on a secured party's right to enforce its security interest against collateral are the requirements that it proceed in good faith (Section 1-203), in a commercially reasonable manner (Sections 9-607 and 9-610).").

And the answer to that question necessarily hinges on the shared history and relationship between those competing creditors because the question is whether shuffling *among those interests*, not invalidating any of them, is justified. *See id.* § 1309.317(A). And that means as a practical matter that reordering based on bad faith would only ever happen based on a senior creditor's actions directed at, or taken within a relationship with, the junior creditor seeking to jump ahead of the bad actor in line.

The UCC caselaw that the trustee cites supports this directional aspect that we discern in the bad-faith reordering analysis. Courts have used a party's bad faith directed "toward" another creditor to reorder those parties' interest. *Thompson v. United States*, 408 F.2d 1075, 1084 (8th Cir. 1969) ("[L]ack of good faith . . . toward the government" justified "alter[ing] priorities which otherwise would be determined under Article 9."); *see Lowry*, 570 F.2d at 121 (observing "the good faith provision of the UCC 'permits the consideration of the lack of good faith . . . to alter priorities which otherwise would be determined under Article 9'" (quoting *Thompson*, 408 F.2d at 1084)). But because a priority dispute is not about invalidation, these cases invariably determine only whether the relationship between the competing interests involved justifies reordering among those creditors. None of the trustee's cases support broader reordering among other creditors who lacked any relationship to the bad acts or actor. And this makes sense, because, as repeatedly mentioned, the priority test is not about invalidation.

Here are a few examples.  In *Affiliated Foods*, the Iowa Court of Appeals held that a senior secured creditor was "estopped from asserting [its] secured interest prior to the interests of" a junior creditor because the senior creditor had "induced [the junior one] to believe that [it] would be given" a higher priority than the senior creditor.  426 N.W.2d at 648.  And in *Farm Credit*, the Georgia Court of Appeals concluded that a secured creditor's misrepresentations to unsecured farmers about a third party's ability to repay the farmers could support subordination in favor of the farmers.  718 S.E.2d at 599.

Unlike the normal priority-dispute analysis which requires at least two actual competing security interests, the priority analysis under OUFTA's definition of valid lien only requires one—the interest whose validity is at issue.  The definition of "valid lien" provides the other interest—a generic hypothetical later obtained judicial lien.  *See* Ohio Rev. Code § 1336.01(M).

This distinction between the usual priority dispute and the OUFTA definitional one decides this case.  In a priority dispute, Textron's perfected 2002 security interest would prevail over a "judicial lien subsequently obtained" absent priority reordering.  Ohio Rev. Code §§ 1309.317(A), 1336.01(M); *see also Comer*, 716 N.E.2d at 249 ("In order for" a security interest to be "effective against the holder of a judicial lien subsequently obtained," "the security interest must be perfected.").  The UCC duty of good faith can impact the enforceability of a senior priority interest over a junior one in a priority dispute between two actual competing interests.  *See* Ohio Rev. Code § 1309.625(A) & cmt 2.  But because of the nature of the priority analysis and the right it creates—a test for priority rather than validity—there is a directional component built into the bad-faith inquiry.  The analysis is necessarily specific to the relationship between the parties in the priority contest.  And that means the type of bad faith needed to reorder priority is bad faith within a relationship that involves at least two competing creditors.

But that type of bad faith could never happen under the OUFTA test because that test requires ranking a security interest's priority against a hypothetical generic subsequent judicial lien.  *See* Ohio Rev. Code §§ 1309.317(A), 1336.01(M).  In no case would it be possible for a party to have a relationship with or direct its bad faith at a non-existent entity.  And because that is the case, subordination would never happen.  So a perfected interest is by definition a "valid

lien" under OUFTA. *Cf. Longo Constr., Inc. v. ASAP Tech. Servs., Inc.*, 748 N.E.2d 1164, 1170 (Ohio Ct. App. 2000) ("In order to be a valid lien, the lien must be 'effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings.' This ordinarily means that a security interest must be perfected . . . ." (citation omitted)); *Comer*, 716 N.E.2d at 249 (To be valid, a lien "must be perfected."); *Permasteelisa CS Corp. v. The Airolite Co.*, No. 2:06-CV-569, 2007 WL 4615779, at *6 (S.D. Ohio Dec. 31, 2007) ("Generally, a 'valid lien' equates to a perfected security interest.").

The district court correctly rejected the trustee's bad-faith-invalidation argument at summary judgment. We affirm that decision.

IV

In 2004, the 2002 revolver agreement was set to expire, and one of the two lending banks wanted out. But Fair Finance wasn't interested in sunsetting its "very profitable" revolver relationship with Textron. (R. 323-35, Credit Modification Request, PageID 62710.) And so when the revolver was set to expire, Textron and Fair Finance renewed, extended, and altered the revolver, allowing the other bank to exit.

Loan payments encumbered by the perfected 2002 security interest are not transfers under OUFTA and thus cannot be avoided as fraudulent transfers. But if Textron and Fair Finance's actions in 2004 novated the 2002 agreement and security interest rather than renewing them, then Fair Finance may have transferred a new security interest through the 2004 agreement. And that new security interest itself might be avoidable as a fraudulent transfer given Textron's knowledge of the Ponzi scheme at that time. That would mean that post-2004 transfers would not have the protection of a valid lien and would thus be avoidable.

A jury, however, determined that the 2004 changes did not amount to novation. The trustee argues that the jury reached this conclusion because of a faulty jury instruction that incorrectly stated Ohio law and poisoned the jury verdict on this issue. We disagree with the trustee. To the extent there was any error, it was harmless.

The jury instruction on novation stated:

> A contract of novation is created when a previous valid obligation is extinguished and replaced by a new valid contract. In order to find that a novation occurred, you must determine if the parties intended, knew of, and consented to, the creation of a valid new contract.
>
> When a promissory note is executed between the parties, there is a presumption in favor of finding that a new loan transaction is a renewal of the original debt that retains the same security interest.
>
> In order to overcome this presumption, the Trustee must prove with clear and definite evidence that the parties knew of, and consented to, the extinguishment of the old debt and security interest and the creation of a new agreement.

(R. 469, Trial Tr., PageID 71838.)

The trustee argues that the language describing a "presumption in favor of finding that a new loan transaction is a renewal of the original debt that retains the same security interest" misstated Ohio law. He does not, however, contest that Ohio law requires "clear and definite evidence" of the parties' intent to novate. Nor does he contest that he had the burden of proof on this issue.

Textron argues there are four reasons the trustee cannot prevail: (1) the instruction was the law of the case under our prior decision; (2) the trustee did not preserve a specific aspect of the argument; (3) the instruction correctly stated Ohio law; and (4) if there was an error, the error was harmless. We agree with Textron as to harmless error. This is sufficient to affirm.

We note that there is caselaw support, albeit older, for a pro-renewal presumption under Ohio law. *See Madlener v. Greathouse*, 31 Ohio Law Abs. 434, 439 (Ohio Ct. App. 1939) ("It is well settled in Ohio that the giving of a renewal note does not have the effect of creating a new debt, . . . unless it has been so agreed between the parties; the presumption is that it is conditional, not an absolute payment of the obligation."); *Kuerze v. W. German Bank*, 12 Ohio App. 412, 418 (Ohio Ct. App.), *aff'd*, 127 N.E. 924 (Ohio 1919) ("The law is that where a new note is given to take up an indebtedness, the presumption is that it is in conditional payment and not absolute payment of the obligation."). And federal courts applying Ohio law have weighed in as well. *See, e.g.*, *Noland v. Wilmington Sav. Bank* (*In re D & K Aviation, Inc.*), 349 B.R. 169, 177 (Bankr. S.D. Ohio 2006) ("Ohio law . . . provides for a presumption in favor of renewal

where a new note has been executed by the parties.").**2** But because harmless error resolves the issue, we do not need to decide whether the jury instruction was faulty as a matter of Ohio law.

Even if we assume that the jury instruction was faulty as the trustee alleges, no harm obtains. Neither party disputes that intent to novate is the key to novation under Ohio law. And neither disputes that the trustee must show intent by clear and definite evidence. The instruction properly focused on whether "the parties intended, knew of, and consented to, the creation of a valid new contract." (R. 469, Trial Tr., PageID 71838.) And although it included a presumption (assuming here, of course, that was error), it also correctly explained the standard needed to show novation: "In order to overcome this presumption, the Trustee must prove with clear and definite evidence that the parties knew of, and consented to, the extinguishment of the old debt and security interest and the creation of a new agreement." (*Id.*) The space between the trustee's proposed instruction and the one given is razor thin. He asked for an instruction that said novation is never presumed but must be shown by clear and definite evidence. What he got was an instruction that said that novation must be shown by clear and definite evidence. Any possible error was harmless.

V

Even without novation in 2004, the trustee argues that he can still avoid post-2004 transfers because the 2004 agreement extinguished the 2002 debt and replaced it with a new debt "obligation." That new "obligation," he contends, is avoidable under OUFTA because both a "transfer made" and "*an obligation incurred*" are potentially avoidable as fraudulent transfers under that act. Ohio Rev. Code § 1336.04(A) (emphasis added).

Textron calls this a "semantic re-cloaking of the novation theory." (Appellee Br. at 44.) We agree.

---

**2** In the previous iteration of this case before this court, we favorably cited *In re D & K Aviation* for that same proposition, explaining parenthetically that case's holding. *In re Fair Fin. Co.*, 834 F.3d at 667. The district court looked to that parenthetical on remand in formulating the jury instructions. (R. 468, Trial Tr., PageID 71637 ("I just want the record to be clear that the language I used in the jury instruction on novation was taken verbatim from the Sixth Circuit opinion.").)

The point of novation is to "extinguish[] by a new valid contract" "a previous valid *obligation*" and replace it with a different one.  *McGlothin v. Huffman*, 640 N.E.2d 598, 601 (Ohio Ct. App. 1994) (emphasis added).  So if we presume, as the trustee's argument does, that the 2004 Agreement renewed rather than novated the 2002 debt, then the 2004 agreement renewed rather than extinguished the 2002 debt obligation.  And that means that there was no new "obligation incurred" in 2004 that could be avoidable as a fraudulent transfer.  The district court correctly rejected this convoluted argument below.

VI

We **AFFIRM**.